WILLIAM H. HOUSER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18937-88.          Filed February 13, 1991.

*Kenneth R. Hughes*, for the petitioner.
*Ronald T. Jordan*, for the respondent.

CHABOT, *Judge:* This matter is before us on petitioner's motion to suppress evidence on the ground that his Fourth Amendment rights were violated during the searches in which the evidence was seized.

Respondent determined deficiencies in Federal individual income tax and additions to tax against petitioner as follows:

| | | Additions to tax | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1)[1] | Sec. 6651(a)(2) | Sec. 6653(b) | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
| 1977 | $21,942.10 | - - - | - - - | $10,971.05 | - - - | - - - | - - - |
| 1978 | 17,318.82 | - - - | - - - | 8,659.41 | - - - | - - - | - - - |
| 1979 | 22,322.85 | - - - | - - - | 11,161.43 | - - - | - - - | - - - |
| 1980 | 32,110.60 | - - - | - - - | 16,055.30 | - - - | - - - | - - - |
| 1981 | 45,888.34 | - - - | - - - | 22,944.17 | - - - | - - - | - - - |
| 1982 | 59,526.16 | - - - | [2]($282.33) | - - - | $41,993.83 | * | $14,272.65 |

[1]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue. The substance of sec. 6653(b) as in effect for 1977 through 1981, and sec. 6653(b)(1) as in effect for 1982 through 1984, appears in secs. 6651(f) and 6663 of present law. The substance of sec. 6661 as in effect for the years in issue appears in sec. 6662(d) of present law.

[2]Under sec. 6653(d), if a fraud addition to tax is assessed with respect to an underpayment, then no sec. 6651 addition to tax is to be assessed with respect to that underpayment. (See secs. 6664(b) and 6651(f) of present law.) The notice of deficiency states that, "Therefore, the

| | | Additions to tax | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6653(b) | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
| 1983 | 51,598.86 | --- | --- | --- | 25,799.43 | ** | 12,899.72 |
| 1984 | 32,834.25 | ($2,205.41) | (1,718.24) | --- | 51,579.63 | *** | 8,208.56 |

*The addition to tax is calculated as 50% of the interest due on $57,090.58.

**The addition to tax is calculated as 50% of the interest due on $51,598.86.

***The addition to tax is calculated as 50% of the interest due on $32,834.25.

By second amendment to answer and by answer to amended petition, respondent asserted increased deficiencies, and corresponding increases in additions to tax, for each year except 1984.

The issues for decision are as follows:

(1) Whether a search and seizure by State officers was unconstitutional;

(2) If so, then whether respondent's employees participated in the search and seizure to such an extent that the evidence secured thereby is to be suppressed.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioner resided in Cincinnati, Ohio.

Petitioner was a physician in general practice during all the years in issue. Petitioner's offices included a principal business office (hereinafter sometimes referred to as petitioner's office) and a subsidiary office at his residence (hereinafter sometimes referred to as petitioner's residence). Petitioner started practicing at petitioner's residence about 1961 or 1962. Petitioner started practicing with another doctor at petitioner's office about 1968. About 1974, the other doctor left and petitioner continued practicing at both locations. Petitioner's practice included a general practice;

previously assessed addition to the tax for filing a delinquent return for the year 1984 * * * [and the previously assessed addition to the tax for failure to pay for the years 1982 and 1984] is abated."

more than 50 percent of his practice was weight control work. The weight control medications petitioner dealt in were controlled substances.

Petitioner's medical practice included dispensing prescription drugs from his offices.

On May 27, 1983, Bruce Koehn (hereinafter sometimes referred to as Koehn) visited petitioner's office. Koehn was an agent of the Hamilton County, Ohio, Regional Enforcement Narcotics Unit (hereinafter sometimes referred to as RENU). Charles Young (hereinafter sometimes referred to as Young), an investigator for the Ohio State Medical Board, accompanied Koehn. Petitioner was not at petitioner's office at that time. Janet Grieco (hereinafter sometimes referred to as Grieco), petitioner's office manager, refused to allow Koehn and Young to inspect any records in petitioner's absence. Koehn communicated with petitioner, who agreed to meet with Koehn at petitioner's office the next day.

In addition to being petitioner's office manager, Grieco was a nurse. Grieco dispensed medication when petitioner ordered her to do so; she gave injections when petitioner ordered her to do so.

Petitioner had left some vitamins to be picked up on May 27, 1983, for an elderly housebound patient. The patient was cared for by a neighbor. The neighbor's son came to pick up the vitamins at petitioner's office. While Koehn and Young were present, Grieco gave the vitamins to the boy, the boy gave her money for the vitamins, and she gave a receipt to the boy. Young told Grieco she could not do that, she was practicing medicine without a license. Young took the medicine from the boy, but eventually returned it to him.

On May 28, 1983, Koehn again visited petitioner's office. Petitioner spent about 4 hours showing to Koehn the procedures that petitioner used in examining patients, prescribing medications, recording patient information and drug dispensing information, and packaging and inventorying the drugs. Petitioner took Koehn through petitioner's office and through the office at petitioner's residence. Koehn told petitioner that he (Koehn) saw nothing wrong with petitioner's procedures and would give the results of his

inspection to Young. Koehn's inspection of May 28, 1983, was without a warrant.

On or about June 1, 1983, Koehn and several local police officers came to petitioner's office to arrest Grieco. Grieco was away from petitioner's office. When she returned, and petitioner told her about the police officers' visit, she went to the police station. She was arrested for practicing medicine without a license, Young having sworn out the arrest warrant. Later that year, after a 3-day trial, the court dismissed the charges. Grieco then filed a false arrest and malicious prosecution civil suit against Young, Koehn, and two of the local police officers. The trial in the civil case was repeatedly postponed; the last time, it was scheduled for about August 23, 1985.

On August 21, 1985, Koehn and Fred Williams (hereinafter sometimes referred to as Williams), of the Ohio Board of Pharmacy, came to petitioner's office. Koehn told petitioner that he and Williams had come to inspect petitioner's office and the places where petitioner kept drugs. Koehn and Williams did not have a warrant. When petitioner challenged them, Koehn said that he and Williams were proceeding under the authority of section 3719.13 of the Ohio Revised Code[3], a copy of which Koehn showed to petitioner during this meeting. Koehn's duty with RENU was to monitor healthcare facilities, pharmacies, doctors' offices, and hospitals. Koehn and Williams visited petitioner's office to conduct a general inspection because Koehn had visited a pharmacy and noticed that an unusually large quantity of an amphetamine had been sent by the pharmacy to petitioner.

Koehn told petitioner that some of the drugs (controlled substances used in weight control) were outdated and some

---

[3]Ohio Revised Code sec. 3719.13 provides as follows (Page's Ohio Revised Code Annotated, 1987 Supplement):

Sec. 3719.13 Inspection of prescriptions, orders, records, and stock.

Prescriptions, orders, and records, required by Chapter 3719. of the Revised Code, and stocks of dangerous drugs and controlled substances, shall be open for inspection only to federal, state, county, and municipal officers, and employees of the state board of pharmacy whose duty it is to enforce the laws of this state or of the United States relating to controlled substances. No person having knowledge of any such prescription, order, or record shall divulge such knowledge, except in connection with a prosecution or proceeding in court or before a licensing or registration board or officer, to which prosecution or proceeding the person to whom such prescriptions, orders, or records relate is a party. [This text does not include an amendment which took effect Mar. 17, 1987.]

were mislabeled; Koehn and Williams "embargoed" some of the drugs and took the drugs with them. Koehn insisted that petitioner produce invoices and the required Drug Enforcement Agency (hereinafter sometimes referred to as DEA) records. Petitioner telephoned his attorney, who was not then available. At Koehn's insistence, petitioner produced petitioner's invoices and some of petitioner's DEA records. Petitioner told Koehn that the other DEA records were at petitioner's residence.

Later that evening, petitioner spoke with his attorney by telephone. Williams also spoke with petitioner's attorney during that telephone call. Koehn understood that petitioner was to produce the remaining DEA records the next day. However, the next day, when Koehn telephoned petitioner to confirm the meeting to turn over the records, petitioner told Koehn that petitioner's attorney told petitioner not to turn over the records. Thereupon, Koehn telephoned petitioner's attorney, who told Koehn to wait a week or so. Koehn took this as a refusal, and went forward with the alternative of securing search warrants.

Because of the publicity attending the August 21, 1985, inspection, Grieco postponed the scheduled trial of her civil suit against Koehn and others. Eventually, the suit was dropped.

Based largely on the August 21, 1985, inspection of petitioner's office, Koehn submitted affidavits for search warrants of petitioner's residence and petitioner's office. The affidavits stated that Koehn believed that petitioner's office and petitioner's residence each had "an extremely large amount of drugs which are misbranded and do not contain labels as mandated by O.R.C. section 3715.64". The affidavits also stated that at the August 21, 1985, inspection, Koehn and Williams observed large quantities of drugs which were mislabeled, in petitioner's own unknown code, placed in the wrong containers, and had the expiration dates removed. Further, the affidavits stated the DEA Forms 222 (drug purchase forms) were not available as required by Ohio Revised Code section 3719.13.

The warrants to which the affidavits were attached, were signed by a Hamilton County Municipal Court Judge at 6:20 p.m. on August 27, 1985.

Each warrant commanded the Sheriff of Hamilton County, "with the necessary and proper assistance," to enter the specified premises "and there diligently search for the goods, chattels, or articles, to-wit: Drugs, misbranded as defined in O.R.C. section 3715.64 and records of controlled substances received, administered and dispensed as defined in Section 3719.07 O.R.C."

Koehn organized the operation to execute the two search warrants. Koehn assigned the men who were to go to each location. Koehn personally led the group that went to petitioner's residence. Another RENU agent and a local police officer led the group that went to petitioner's office. Williams, who was not a law enforcement officer, went with the latter group.

Shortly before 8 a.m on August 28, 1985, Koehn went to petitioner's residence to execute the appropriate search warrant. Petitioner was the only person inside petitioner's residence at that time. Koehn advised petitioner of his constitutional rights, but petitioner was not arrested. Koehn initially had with him RENU agents and local police officers, four or five altogether; he did not have any Internal Revenue Service employees with him at the start. As the search progressed, the officers and agents discovered large amounts (about 6,000 pounds, including containers) of drugs (mostly amphetamines) in all portions of the building, the residential portion as well as the business portion. Koehn called the DEA's Cleveland office for assistance in inventorying the drugs. That office sent people who arrived in early or midafternoon. A bedroom had been converted to a drug storage room. At the foot of the bed in that bedroom was a laundry bag with large amounts of currency; there were many small-denomination bills and a few large-denomination bills in the laundry bag, as well as some unmounted stones that appeared to be diamonds. The laundry bag was discovered about, or after, 10 a.m.

At that time in 1985, it was RENU policy to notify the IRS if RENU found $10,000 or more in cash. When Koehn found the laundry bag, he concluded that it held a "lot of money" and he telephoned the IRS. Koehn had not expected to find so much cash as to trigger a call to the IRS. There was no

preexisting agreement between the State officers and the IRS to furnish information to the IRS regarding petitioner.

In midmorning, probably between 10 and 11 a.m., Koehn telephoned the Cincinnati office of the Criminal Investigation Division of the IRS. Koehn asked to speak to the "head investigator"; there was no specific contact person. At that time, the IRS was not conducting a criminal investigation of petitioner. The IRS was called after the investigation, issuance of the warrant, and beginning of the searches and seizure of some evidence (but before the searches and seizures were completed).

In response to the telephone call, several IRS special agents were sent to each of the search sites and one revenue agent (Lawrence Kuhlmann, hereinafter sometimes referred to as Kuhlmann) was sent to petitioner's residence. They arrived between 11 a.m. and noon. Later, additional IRS agents were sent to both of the search sites. Also, at some time in the afternoon, at least one of the IRS agents left petitioner's office and came to petitioner's residence. Altogether, almost 10 IRS agents were present at one or both of the search sites during the searches. Most of the IRS employees were at petitioner's residence.

Kuhlmann was assigned to accompany the special agents to petitioner's residence. When he arrived at petitioner's residence, he was set to work inventorying the currency and other items that were in the laundry bag that Koehn found. Two other IRS agents watched Kuhlmann count the money. It was respondent's policy to have at least two people present while discovered money was counted.

Kuhlmann stayed at that task for the 7 hours or so that he was at petitioner's residence. He did not see any of petitioner's business records while he was working at petitioner's residence. When he left petitioner's residence Kuhlmann accompanied the State officers who brought the currency and stones to a police station, downtown; he did not go to petitioner's office. Some of the IRS agents also helped count the seized drugs and prepare a return of the bottles taken. Another agent was writing down the approximate size of the jewelry and raw diamonds.

The currency in the bag amounted to more than $98,000. The jewelry that was seized was appraised at about $250,000.

The other search warrant was executed at petitioner's office. Those in charge of that task waited until some of petitioner's employees arrived at petitioner's office, so that they would not have to break into those premises.

Both searches continued until after midnight. At both search sites, large amounts of records and controlled substances were seized.

About 2 days after the searches and seizures, Kuhlmann was told that he would have to examine the seized records. He was not given any indication before that time that any seized material would be of interest to respondent.

About 6 days after the warrants were executed, Kuhlmann and three other revenue agents went to the RENU offices to inspect the materials that had been seized under the warrants and brought there. Only after Kuhlmann and the other revenue agents began to examine the seized materials did they come across a series of records, maintained by petitioner, that showed for each day petitioner's patients' names, each patient's payments, and certain information as to each patient's medications. (These records are hereinafter sometimes referred to as day sheets.) The day sheets had been seized by the RENU agents because of the information on them as to the amount and type of drugs that petitioner had given to his patients.

Most of the day sheets had been seized from petitioner's office, which was where they had been maintained. Kuhlmann did not see any of the day sheets during the execution of the warrants. The day sheets that were seized from petitioner's office, were seized pursuant to the search warrant for the office, and are the predominant evidence on which respondent relied in determining the understatements of taxable income against petitioner for 1977 through 1984.

The day sheets in dispute cover the period from January 5, 1977, through December 7, 1984. The earliest sheets show the following items: a narrow unheaded column with initials, a wide unheaded column with names, an unheaded empty column, and a series of columns headed "Cash", "Charge", "P.O.A.", "Schedule III", and "Schedule IV",

respectively. On the first few day sheets, the cash column has many entries, the Charge and P.O.A. columns have very few entries, and the Schedule III and Schedule IV columns have no entries. By the March 7, 1977, day sheet, a few of the names are followed by addresses and a few entries appear in the Schedule III and Schedule IV columns. By the April 8, 1977, day sheet, almost all the names are followed by addresses and almost all the lines in the Schedule III column have entries. In the middle of the May 10, 1977, day sheet, there is an end to the listing of addresses and of entries in the Schedule III and Schedule IV columns. Through the May 8, 1978, day sheet, the pattern of entries shifts back and forth. Beginning with the June 16, 1978, day sheet: (1) Almost all of the names are followed by addresses, (2) the Cash, Charge, and P.O.A. headings are moved one column to the left, (3) the column that had been headed P.O.A. is headed "Schedule II", and (4) entries appear on almost every line of this new Schedule II column.

Schedule II drugs include amphetamines, some sedatives, and some analgesics; they are controlled substances. Schedule III drugs include cough syrups that contain codeine or antitussives, and phenobarbital. Schedule IV drugs are less addictive drugs. By examining the day sheets that were seized from petitioner's office, one could determine the amount of controlled substances that petitioner distributed.

It had been Koehn's intention from the start of the search to seize records of dispensing of drugs and of DEA order forms to enable him to do a complete audit of petitioner's drug transactions. The drug dispensing information on the day sheets thus made the day sheets an initial target of Koehn's search and seizure operation. Respondent's agents did not indicate which records should be seized. Respondent's agents only responded to requests by the State officers as to whether certain records may have been connected with drug sales. Koehn initially had no interest in the financial information on the day sheets. However, Koehn's discovery of the bag of currency and jewelry caused him to suspect that petitioner might have made illegal sales of drugs, and so he began to seize records that might show petitioner's cash-flow.

The day sheets were used in determining the deficiencies under the notice of deficiency; the currency was not used, the jewelry was not used, and a promissory note that had been discovered was not used.

In 1986, petitioner was indicted on more than 70 counts. The counts included drug trafficking and mislabeling. Petitioner pleaded guilty to 9 or 10 of these counts.

———

Respondent did not play any role in the decision by the State officers to investigate petitioner. Respondent did not play any role in the decision by the State officers to conduct the August 21, 1985, warrantless inspection. Respondent did not play any role in the decision by the State officers to obtain warrants to conduct the August 28, 1985, searches and seizures. Respondent's agents did not know that anything was happening along those lines until Koehn's telephone call, several hours into the operation on August 28, 1985.

None of the State officers' actions up to the time of that telephone call were undertaken in order to provide information or assistance to respondent.

None of respondent's agents at petitioner's residence or petitioner's office was assigned a separate search function. None of respondent's agents decided what materials were to be seized. None of respondent's agents took evidence into their custody during the searches and seizures.

The State officers seized the day sheets for State law enforcement purposes and not Federal purposes. Respondent's agents were not aware of the day sheets until 6 days after the searches and seizures.

Koehn did not act in bad faith in conducting the warrantless inspection of August 21, 1985, or in securing the warrants and conducting the searches and seizures of August 28, 1985.

OPINION

Petitioner contends that (1) the inspection of August 21 and search and seizure of August 28, 1985, violated his Fourth Amendment rights and constituted an illegal search

and seizure; (2) respondent's agents "assisted and substantially participated in the aforementioned illegal search and seizure"; (3) respondent's evidence was illegally seized from petitioner and constituted the fruits of an illegal search; and (4) exclusion of this evidence from the instant case is appropriate because it "will have the proper deterrent effect against such conduct by such federal officers".

Respondent maintains that (1) the August 21, 1985, inspection was authorized by Ohio law and the warrants for the August 28, 1985, searches and seizures were valid; (2) whether or not the searches and seizures were constitutional, respondent's agents' involvement was not sufficient to justify exclusion; (3) the evidence on which respondent relies was within the scope of the warrants and was seized for proper State purposes unrelated to the tax laws; and (4) exclusion of this evidence "would not serve as a deterrent of potentially illegal activities carried on by Internal Revenue Service agents".

We agree with respondent that his agents' involvement was not sufficient to justify exclusion.

The Fourth Amendment to the United States Constitution[4] prohibits "unreasonable searches and seizures", and provides standards for the issuance of warrants. The limitations of the Fourth Amendment apply to the States, through the first section of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643 (1961); *Wolf v. Colorado*, 338 U.S. 25 (1949).

In order to effectuate the rights guaranteed by the Fourth Amendment, the Supreme Court has determined that evidence obtained in violation of the Fourth Amendment (and the fruits of the illegally seized evidence) cannot be used in criminal proceedings against the victim of the illegal search and seizure. The purpose of this rule of excluding such illegally obtained evidence is to deter future unconstitutional governmental conduct, and not to redress the injury to the victim of the unconstitutional conduct. The exclusionary rule, despite its broad deterrent purpose,

---

[4]The Fourth Amendment to the United States Constitution provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

does not prohibit the use of illegally seized evidence in all proceedings. Suppressing evidence on Fourth Amendment grounds is appropriate only where the remedy of deterring future unconstitutional conduct is thought most efficaciously served. See *United States v. Calandra,* 414 U.S. 338, 347-348 (1974), and cases there discussed.

The Supreme Court has established that the exclusionary rule applies to exclude unconstitutionally obtained evidence from a Federal criminal trial of the victim of the unconstitutional search and seizure, even if the unconstitutional actions were only those of State officers without any participation by Federal officers (thus overturning the "silver platter" doctrine). *Elkins v. United States,* 364 U.S. 206 (1960).

The Supreme Court has also established that the exclusionary rule does not apply to exclude unconstitutionally obtained evidence from a Federal civil tax trial[5] of the victim of the unconstitutional search or seizure, if the unconstitutional actions were only those of State officers and the State officers had "no responsibility or duty to, or agreement with," the Federal Government. *United States v. Janis,* 428 U.S. 433, 455 (1976) (involving a suit for refund of wagering taxes imposed by section 4401).

The Supreme Court has not determined whether the exclusionary rule is to be applied in a civil proceeding involving an intrasovereign violation, i.e., where there is Federal participation in, or involvement in, or encouragement of, the search or seizure. *United States v. Janis,* 428 U.S. at 436 n.3, 455 n.31.

The burdens of production and persuasion generally rest upon the movant in an evidence suppression hearing. *United States v. Giacalone,* 853 F.2d 470, 482 (6th Cir. 1988); *United States v. De La Fuente,* 548 F.2d 528, 533-534 (5th Cir. 1977)[6]; see *Vallone v. Commissioner,* 88 T.C. 794,

---

[5]The instant case is a civil case, notwithstanding the determination by respondent that petitioner is liable for additions to tax on account of fraud. *Black Forge, Inc. v. Commissioner,* 78 T.C. 1004, 1012-1013 (1982). ·

[6]Many shorthand judicial statements appear to take the contrary position. The basis for such statements is explained in the following comments in *United States v. De La Fuente,* 548 F.2d 528, 533-534 (5th Cir. 1977):

(b) *Burdens of proof in suppression hearings.*—It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing. E.g., *Rogers v. United States,* 330 F.2d 535 (5 Cir. 1964); *Addison v. United States,* 317 F.2d 808 (5

809-810 (1987).

In order to persuade us to grant his motion to suppress the evidence, petitioner has the burden of proving both:

(1) The search or seizure was unconstitutional; and

(2) respondent's participation was sufficient so that it would be appropriate to exclude the evidence to deter future unconstitutional searches and seizures.

See *United States v. Janis*, 428 U.S. at 455 n.31; *Guzzetta v. Commissioner*, 78 T.C. 173, 180 (1982).

We consider the second question, relating to the extent and effect of respondent's participation. For purposes of our analysis of this question, *and only for this purpose*, we assume that the actions of the RENU and other State officers violated petitioner's Fourth Amendment rights.[7]

There is no clear definition of the level or nature of Federal involvement to constitute Federal participation which would result in an *intra*sovereign violation (suppression undecided by *Janis*) rather than an *inter*sovereign violation (suppression denied by *Janis*). There appears to be

---

Cir. 1963); *Wilson v. United States*, 218 F.2d 754 (10 Cir. 1955); *White v. United States*, 194 F.2d 215 (5 Cir. 1952); *Jarabo v. United States*, 158 F.2d 509 (1 Cir. 1946). Concededly, in some well-defined situations the ultimate burden of persuasion may shift to the government upon an initial showing of certain facts by the defendant. For example, if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search. E.g., *Manuel v. United States*, 355 F.2d 344 (5 Cir. 1966). Or if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination. E.g., *United States v. Crocker*, 510 F.2d 1129 (10 Cir. 1975). Similarly, if a defendant seeks to suppress evidence as the fruit of an illegal wiretap and he proves that the tap was in fact unlawful, the burden shifts to the prosecution to prove that the evidence in question was obtained from another source and is not tainted by the illegal surveillance. E.g., *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). The instant case, however, does not fall within any of these established categories in which the government may bear the ultimate burden of persuasion. And even in those situations, the defendant must first discharge his initial burden of producing some evidence on specific factual allegations sufficient to make a prima facie showing of illegality. E.g., *Nardone v. United States, supra.*

[7]It is a commonplace that we are not to decide constitutional questions unless they are properly presented (e.g., *Kessler v. Commissioner*, 87 T.C. 1285, 1293-1294 (1986), affd. without published opinion 838 F.2d 1215 (6th Cir. 1988)) and must be decided in order to resolve the dispute that we have jurisdiction to resolve (e.g., compare in *Kessler* our treatment of the taxpayers' challenge to the classification scheme of sec. 170 (87 T.C. at 1287-1293) with our treatment of their challenge to the basic validity of sec. 170 (87 T.C. at 1293)). Accordingly, consistent with our approach in such matters (*Guzzetta v. Commissioner*, 78 T.C. at 173, 175 n.2), we have not determined whether the actions of the State and local officers were unconstitutional. We also do not decide whether the initial warrantless inspection was constitutional. See *Tirado v. Commissioner*, 689 F.2d 307, 309 n.2 (2d Cir. 1982), affg. 74 T.C. 14 (1980).

a continuum, as to both type and extent of Federal activity, with few opinions to mark the permissible margins.

In the instant case, respondent did not play any role in the decision by the State officers to investigate petitioner, to conduct the August 21, 1985, warrantless inspection, or to obtain warrants to conduct the August 28, 1985, searches and seizures. Respondent's agents did not know that anything was happening along those lines until Koehn's telephone call, several hours into the operation on August 28, 1985. Also, none of the State officers' actions up to that point were undertaken in order to provide information or assistance to respondent. In these regards, the instant case is similar to *Frazier v. Commissioner,* 91 T.C. 1 (1988); *Black Forge, Inc. v. Commissioner,* 78 T.C. 1004 (1982); and *Guzzetta v. Commissioner, supra,* in each of which we held that there was not an intrasovereign violation and that the evidence would not be suppressed.

RENU's policy of notifying respondent when more than $10,000 in cash is found is essentially the same as the "select liaison" policy of the New York City Police Department, described in *Guzzetta v. Commissioner,* 78 T.C. at 174, 180-182. This policy does not create Federal participation under *Janis.*

The instant case parts company with *Frazier, Black Forge,* and *Guzzetta* in that, in the instant case, respondent's agents were physically present during part of the searches and seizures. In evaluating the actions of respondent's agents, it may be useful to consider *Byars v. United States,* 273 U.S. 28 (1927), and *Lustig v. United States,* 338 U.S. 74 (1949).[8]

In *Byars v. United States, supra,* the Supreme Court held there was Federal participation where a Federal officer

---

[8]In the precise contexts (criminal cases) in which *Byars v. United States,* 273 U.S. 28 (1927), and *Lustig v. United States,* 338 U.S. 74 (1949), arose the lessons of those opinions have been made obsolete. That is, since *Elkins v. United States,* 364 U.S. 206 (1960), if the evidence is sought to be used in a Federal criminal case, then it does not make any difference whether Federal officers participated in a State search or seizure. However, in *United States v. Janis,* 428 U.S. 433, 455 n.31 (1976), the Supreme Court cited *Byars* and *Lustig* after stating that it decided *Janis* on the assumption that there was no Federal participation. It stated that the taxpayer remained free on remand to attempt to prove there was Federal participation.

Because of the limited number of cases discussing the Federal participation doctrine, we believe that *Byars* and *Lustig* are helpful, even though they were decided in a criminal case context, since the analysis in those cases focusses on the type and degree of Federal involvement. In both *Byars* and *Lustig,* the Court held that the evidence should be suppressed because there was Federal participation.

actually searched the premises with the State officers, seized evidence that could be used only in prosecution of a Federal crime, and retained all the seized evidence until the time of trial.

The Federal officer testified in *Byars* that he assisted in the search. The Federal officer was assigned his own room to search. He actively searched and seized evidence alongside the State officers. The Federal officer first discovered the evidence and he decided to seize the evidence even though it was not within the purview of the State warrant (there was no Federal warrant). *Byars v. United States,* 273 U.S. at 31-32.

The Court focused on the degree of Federal involvement the Federal officer exercised. The Federal officer "did participate as a federal enforcement officer, upon the chance, which was subsequently realized, that something would be disclosed of official interest to him as such agent." 273 U.S. at 32.

The Court found it significant that the evidence was seized solely to support a Federal conviction, and in no way related to a violation of State law. "The stamps found were not within the purview of the state search warrant, nor did they relate in any way to a violation of state law." 273 U.S. at 32. The officers did not find any intoxicating liquors, which was the subject of the search warrant. Rather, the officers found only stamps used in the process of labeling liquor. At the time the officers took the stamps they did not even know of any State crime in which the stamps could be used. This further demonstrated that the Federal officer was actually conducting a Federal search under the guise of a State search warrant. The Court held that it was in fact a joint operation of both the State and Federal officers. 273 U.S. at 33.

The instant case differs significantly from *Byars* on several points. Firstly, in the instant case the Federal officers were not assigned any separate search functions. That is, none of the Federal officers appears to have operated alone (except perhaps for one agent who took photographs of petitioner's office) and none appears to have looked through any rooms, closets, cabinets, desks, or any other places for any evidence. Secondly, the Federal officers

did not decide what materials were to be seized; the only way in which they assisted in the decision-making process was in responding to requests by the State officers as to whether certain records may have been connected with drug sales—a matter of State concern. Thirdly, the Federal officers did not take any evidence into their custody during the searches and seizures. Fourthly, the critical evidence in the instant civil tax case—the day sheets—was seized by the State officers for State law enforcement purposes and not Federal purposes. Fifthly, the Federal officers were not even aware of the day sheets until the Federal officers discovered them, 6 days after the search and seizure, among the records in the RENU office.

In *Lustig v. United States, supra,* the Supreme Court also held there was Federal participation, and so the evidence should have been suppressed. In *Lustig,* the Federal officer's investigations inspired the search. The Federal officer had received a call from the local police and a call from a hotel manager. 338 U.S. at 75. After the Federal officer looked through the subject's hotel room keyhole and questioned the chambermaid, whose suspicions had led to the investigation, he told the State police that " 'something was going on' ". 338 U.S. at 76. A State warrant was obtained. It had been thought that the subject was counterfeiting race-track tickets, a State crime. The evidence found indicated counterfeiting of currency, a Federal crime. The Federal officer waited at the police station to see what the search would produce. The Federal officer was called by the State police after the hotel room was searched. The Federal officer went to the hotel room and examined the evidence. When the subject returned, he was arrested and searched in the Federal officer's presence. As items were taken out of the subject's pockets, the items relevant to the Federal crime were turned over to the Federal officer. The Federal officer also assisted in gathering and transporting the evidence to the police station. Some of the evidence was given to the Federal officer immediately after the search; all was eventually given to him. 338 U.S. at 77.

In the plurality opinion, Justice Frankfurter described the critical events as follows (338 U.S. at 79):

Though state officers preceded Greene [the Federal officer] in illegally rummaging through the bags and bureau drawers in Room 402, they concerned themselves especially with turning up evidence of violations of the federal counterfeiting laws after Greene joined them. He was an expert in counterfeiting matters and had a vital share in sifting the evidence as the search proceeded. He exercised an expert's discretion in selecting or rejecting evidence that bore on counterfeiting. The fact that state officers preceded him in breach of the rights of privacy does not negative the legal significance of this collaboration in the illegal enterprise before it had run its course. Greene himself acknowledged such participation by his remark about "leaving the room after we had gathered all this evidence together."

The instant case differs significantly from *Lustig* on several points. Firstly, in the instant case the Federal officers did not do any of the prior investigation and had no prior knowledge of a problem or an impending search and seizure. Secondly, the evidence was seized by the State officers because of their understanding that it was involved in a State crime; this was especially true of the day sheets— the critical evidence in the instant case. Thirdly, none of the evidence was given to the Federal officers while they were on the scene; the Federal officers first became aware of it 6 days after the search and seizure.

The selection of records to be seized, although not by itself determinative, is a significant factor in determining whether there was Federal participation. *Lustig v. United States,* 338 U.S. at 79; *Frazier v. Commissioner,* 91 T.C. at 10. This factor is significant as it tends to indicate whether evidence is sought for a State prosecution or for a Federal prosecution. Accordingly, we review with special care all the evidence dealing with this point.

In the instant case, respondent's supervising agent testified that he did not advise any officers which records should be seized. One of respondent's special agents testified that a State narcotics officer did ask him whether or not it was his opinion that financial records (we are not told which financial records) may have been connected with drug sales which was the basis of their search warrant. He testified that the State narcotics officer asked his advice because State narcotics officers do not get involved in financial records and the State officer did not want to seize any

records that were not "part and parcel to what was written on the search warrant."

The State narcotics officer's inquiry appears to have been motivated by a desire to receive confirmation that the State narcotics officer only took the records under the warrant. Further, the inquiry was directed at whether the records would show drug sales; it was not directed at respondent's tax-related interests.

From the foregoing, we conclude that respondent's agents did not participate in the presumed violation of petitioner's Fourth Amendment rights (see *supra* note 7) so as to constitute it an intrasovereign violation. Accordingly, under *Janis* and *Guzzetta,* petitioner's motion to suppress the evidence will be denied.

Petitioner contends that Koehn "engaged in a deliberate and inappropriate course of conduct in dealing with the Petitioner and Janet Grieco." Petitioner suggests that Grieco's suit against Koehn led to, or affected "Koehn's aggressive searches of August, 1985." We note that petitioner's above-quoted comments appear only in that part of his legal memorandum that deals with whether the August 28, 1985, searches and seizures were unconstitutional because the warrants were issued based on erroneous information in Koehn's affidavits. For purposes of our analysis, we have stated that we assumed that petitioner's Fourth Amendment rights were violated (see *supra* note 7).

Our analysis has focused on the second issue discussed in petitioner's legal memorandum, relating to the extent of respondent's agent's involvement in the search and seizure. Koehn's testimony as to the events that occurred appears to be credible and was largely corroborated by a procession of subsequent witnesses, all of whom had been excluded from the courtroom during Koehn's testimony, under Rule 145(a), Tax Court Rules of Practice & Procedure, and Rule 615, Fed. R. Evid. Petitioner, of course, was not excluded from the courtroom during Koehn's testimony and that of the other witnesses. Petitioner was recalled on rebuttal, but his rebuttal testimony went only to his reasons for possession of substantial amounts of outdated drugs. He did not contradict Koehn's testimony on rebuttal. The only potentially major point on which his testimony during petition-

er's case in chief contradicted. Koehn's subsequent testimony was with regard to whether respondent's agents were present when petitioner's residence was entered, before 8 a.m. on August 28, 1985. On that point, Koehn's testimony was corroborated by all the subsequent witnesses. Again, petitioner did not rebut any of this when he returned to the witness box. We believe that petitioner's recollections of that traumatic morning probably were jumbled together, and that the consistent testimonies of Koehn and the others were correct.

In short, we believe Koehn's testimony about what happened, and in particular Koehn's testimony about respondent's agents' involvement in what happened.

Although petitioner does not direct our attention to it, we note that in *Janis* the Supreme Court referred to the role of "good faith" on the part of the State officers.[9] Whether or not Koehn harbored ill will toward Grieco or petitioner on account of Grieco's civil suit against Koehn and others, Koehn's actions on August 21, 1985, and August 28, 1985, struck us as the actions of a law enforcement officer concerned with enforcement of the laws that were within his "zone of primary interest". Koehn's actions led to an indictment of more than 70 counts; petitioner pleaded guilty to 9 or 10 of these counts. We do not believe that Koehn acted in bad faith.

Petitioner cites *United States v. Janis, supra,* as authority for the proposition that "In the event that federal agents participated in an illegal search of Petitioner's residence and offices, the records seized in connection with the illegal search should be excluded from use by Respondent in the instant action." As we have noted, *supra,* the Supreme Court specifically stated that that question was "not presented" by *United States v. Janis,* 428 U.S. at 455 n.31. Clearly, *Janis* does not stand for the proposition for which petitioner cites it. In light of our conclusion as to Federal participation in the instant case, that question is also not presented by the instant case. Since we hold that Federal

---

[9]In *United States v. Janis,* 428 U.S. at 458 n.35, at the end of a lengthy footnote, the Court stated as follows:

In addition, the officers here were clearly acting in good faith, see n.1, *supra,* a factor that the Court has recognized reduces significantly the potential deterrent effect of exclusion. See *Michigan v. Tucker,* 417 U.S., at 447; *United States v. Peltier,* 422 U.S., at 539.

participation did not occur and thus suppression of the evidence is not required, we need not decide whether the State officers' actions were unconstitutional. (See *supra* note 7.)

At the evidentiary hearing, petitioner indicated that he contended that the mere involvement of Federal officers in the search rendered the search and seizure unlawful. This point is not pursued in petitioner's legal memorandum, and so we assume he has abandoned it. In any event, we will not decide a constitutional question unless it is clear that the question has been presented to us. *Kessler v. Commissioner*, 87 T.C. 1285, 1293-1294 (1986), affd. without published opinion 838 F.2d 1215 (6th Cir. 1988). For the same reason, we will not examine into what might be the constitutional effect of the arrival of DEA agents during the afternoon of August 28, 1985. See *Tirado v. Commissioner*, 689 F.2d 307 (2d Cir. 1982), affg. 74 T.C. 14 (1980).

Finally, we have no need to inquire into the applicability of the severability doctrine to a situation where some evidence resulted from constitutional actions and other evidence resulted from unconstitutional actions (see *United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir. 1989), and cases there cited).

Based on the foregoing, we hold, for respondent, that the actions of respondent's agents did not constitute "Federal participation" under *United States v. Janis, supra;* petitioner's motion to suppress evidence is denied.

*An appropriate order will be issued, denying petitioner's motion to suppress evidence.*