T.C. Memo. 2003-347


UNITED STATES TAX COURT


MICHAEL J. DOWNING AND SANDRA M. DOWNING, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12108-98.            Filed December 29, 2003.

Ps resided in Louisiana, a community property State. Shortly before their wedding, in 1989, they "filed for registry" (La. Civ. Code Ann. art. 2332 (West 1985)) in St. Tammany Parish (where both of them then resided) a marriage contract which provided that "The intended husband and wife shall be separate in property * * *." Before the years in issue (1994 and 1995), Ps moved to Jefferson Parish. P-H operated a plumbing business during the years in issue. Ps filed separate tax returns for the years in issue, on which they reported only their respective incomes, without regard to Louisiana's usual community property laws. R determined that (1) substantial amounts of income from P-H's plumbing business had not been reported on Ps' separate income tax returns, (2) the marriage contract did not have the effect of stopping application of Louisiana's usual community property laws for Federal income tax purposes, (3) both Ps are liable for the fraud addition to tax for both years in issue, and (4) there were other miscellaneous adjustments.

1.  <u>Held</u>:  Ps' marriage contract did have the effect of stopping application of Louisiana's usual community property laws for Federal income tax purposes.  R has conceded that such a holding would result in P-W's not being liable for deficiencies and additions to tax for the years in issue; R has asserted against P-H increased deficiencies and additions that are intended to apply if all the omitted income were properly reportable by P-H.

2.  <u>Held</u>, <u>further</u>, R proved by clear and convincing evidence that P-H had unreported plumbing business income for 1994 and for 1995, that each year's unreported plumbing business income resulted in an underpayment of tax for that year, and that at least some part of each year's underpayment of tax was due to P-H's fraud.  Amounts determined.  Sec. 6663, I.R.C. 1986.

3.  <u>Held</u>, <u>further</u>, no portion of the underpayment of tax for either year was not due to fraud, except to the extent the underpayment resulted from causes other than unreported plumbing business income.  Amounts determined. Sec. 6663(b), I.R.C. 1986.

<u>John S. Ponseti</u>, for petitioners.

<u>Susan S. Canavello</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, <u>Judge</u>: By separate notices of deficiency, respondent determined deficiencies in individual income tax and penalties under section 6663[1] (fraud) against petitioners as follows:

---

[1]  Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1986 as in effect for the years in issue.

|  | Year | Deficiency[1] | Penalties Sec. 6663 |
|---|---|---|---|
| Michael J. Downing | 1994 | $7,396 | $5,444 |
|  | 1995 | 29,557 | 22,088 |
| Sandra M. Downing | 1994 | $2,545 | $2,012 |
|  | 1995 | 20,432 | 15,404 |

[1] Of these totals for Michael J. Downing (hereinafter sometimes referred to as Michael), for 1994, $2,773 is income tax under ch. 1 and $4,623 is self-employment tax under ch. 2; for 1995, $19,065 is income tax under ch. 1 and $10,492 is self-employment tax under ch. 2. For Sandra M. Downing (hereinafter sometimes referred to as Sandra), all the amounts are income tax under ch. 1.

Both sides apparently view the facts in the instant case as leading to Michael's being solely liable for self-employment tax on any additional net earnings from self-employment, regardless of the disposition of the community property issue. That is, neither side views Sandra's involvement in the business as resulting in a partnership. See sec. 1402(a)(5)(A). Petitioners did not file joint returns for either of the years in issue (infra note 4), and so Sandra does not have joint and several liability for Michael's self-employment tax. See sec. 1.6017-1(b), Income Tax Regs.; see also Johnson v. Commissioner, 74 T.C. 1057, 1062 (1980), affd. 661 F.2d 53 (5th Cir. 1981).

In each notice of deficiency, respondent determined in the alternative to the fraud penalty that "the addition prescribed by Section 6662(a)" applies (in an unspecified amount) for each year. In the answer, respondent narrows this determination to the negligence penalty, section 6662(b)(1), but the amount remains unspecified.

At trial and on brief respondent conceded that if petitioners' marriage contract was effective to take petitioners out of Louisiana's usual community property matrimonial regime,

then decision should be entered for Sandra that she has no deficiency and no addition to tax for any year in issue. By amendment to answer, respondent asserts in the alternative to the deficiencies and additions to tax determined in the notices of deficiency that, if the Court determines that petitioners' marriage contract has this effect and Sandra does not have any liability, then Michael is liable for deficiencies and penalties as follows:

| Year | Deficiency | Penalties Sec. 6663 |
|------|-----------|---------------------|
| 1994 | $8,966 | $6,725 |
| 1995 | 30,872 | 23,154 |

See sec. 6214(a). Respondent also asserts, in the alternative to section 6663, additions to tax under section 6662(a). See sec. 6214(a).

After concessions by both sides,[2] the issues for decision[3]

_____

[2] Respondent concedes that petitioners are entitled to deduct as 1995 Schedule A, Itemized Deductions, the $58 paid by Michael for Louisiana income tax and the $10,133 of mortgage interest paid.  Both petitioners had claimed the standard deduction for married filing separate on their 1994 and 1995 tax returns.  On brief, petitioners argue that they also are entitled to deduct the $24.90 paid for real property taxes.  On brief, respondent concedes deductibility of this amount.

Respondent concedes that petitioners are entitled to deduct $972 of the $1,871 disallowed Schedule C, Profit or Loss From Business, telephone expenses for 1994; petitioners concede the remaining $899.  Respondent concedes that petitioners are entitled to deduct $744 of the $1,618 disallowed Schedule C telephone expenses for 1995; petitioners concede the remaining $874.

Petitioners concede the entire $1,246 inventory adjustment for 1995.

Respondent concedes that petitioners are entitled to additional Schedule C car and truck expense deductions for 1994 and 1995 in the amounts of $2,318 and $1,337, respectively.  Respondent also concedes that petitioners are entitled to an additional $6,348 depreciation expense deduction for 1995 on the Ford F250 truck.

Respondent concedes that petitioners are entitled to deduct additional Schedule C expenses for 1994 and 1995 in the amounts of $461 and $530, respectively.

In the notices of deficiency, respondent disallowed in full the deductions for Schedule C travel and entertainment expenses.  Petitioners acknowledge on brief that they lack the requisite documents "to enable these expenses to be deductible."  Petitioners contend that they "did incur these expenses * * *.  However, Mr. Downing simply did not know that he was required to keep a detailed log of who he went to lunch with, and what business they discussed."  We treat this as petitioners' concession of the adjustment and, in effect, of the applicability of sec. 6662.

Petitioners concede that Michael underreported 1995 plumbing business gross receipts by $5,781.  That is, the 1995 tax return
(continued...)

are as follows:

(1)  Whether each petitioner omitted from gross income his or her respective community property law one-half interest in the spouse's earnings.

(2) Whether petitioners had unreported Schedule C gross receipts for the years in issue, and, if so, then in what amounts.

(3)(a) Whether petitioners are liable for the civil fraud additions to tax under section 6663, or (b) in the alternative, if petitioners' underpayments (if any) are not due to fraud, then whether petitioners are liable for the negligence additions to tax under section 6662(a).

---

[2](...continued)
shows gross receipts of $82,721--petitioners acknowledge 1995 plumbing business gross receipts of $88,502.

On brief, respondent indicates that respondent's concessions have the effect of reducing the original deficiency notice determination by more than one-third as to Michael and by more than half as to Sandra.  Further concessions were made in the course of certain postbrief proceedings.  Infra note 24. Computations will be required under Rule 155.

Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]  The following adjustments are computational: (1) The deduction for exemptions, (2) the child care credit, and (3) the computation of both Michael's self-employment tax liability and self-employment tax deduction; their resolution depends on our determination of the issues for decision.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioners resided in Metairie, Louisiana. Metairie is in Jefferson Parish.

Petitioners filed timely calendar year tax returns for the years in issue, using the filing status "married filing separate".[4]

A. Michael's Background

Michael was born in 1963. He began working when he was 12. His jobs included cutting lawns and washing cars; he initially charged $5 per lawn and about $10 per car. Michael worked after school, on weekends, and throughout the summers. During high school, Michael continued to cut lawns; he also worked at Fasullo's Drug Store. In addition, as part of his schooling,

---

[4] After the notices of deficiency were mailed to petitioners, petitioners submitted Forms 1040X, Amended U.S. Individual Income Tax Return, for 1994 and 1995, in which they changed their filing status from "married filing separate" to "married filing joint" and claimed the earned income credit. Sec. 6013(b)(2)(C) prohibits spouses from making a joint return after they have previously filed separate returns if a notice of deficiency has been mailed to either spouse with respect to the tax for that taxable year, and the spouse has filed a petition with the Tax Court. See Phillips v. Commissioner, 86 T.C. 433 (1986), affd. in part and revd. in part 851 F.2d 1492 (D.C. Cir. 1988). At trial, petitioners conceded that their filing status is "married filing separate". Consequently, they are not entitled to the earned income credit. See sec. 32(d).

Michael worked half time at JEDCO for 1 year, where he received training in plumbing and auto mechanics. Michael saved the money that he earned from these jobs; he did not deposit this money into a bank because he believed that was inconvenient. Indeed, he did not open a bank account until March of 1989.

In 1982, Michael was graduated from high school. His first job thereafter was as a courier for Suburban Coastal Corporation. After he left Suburban Coastal Corporation, he worked at Nature Tubs and Spas, where he installed and plumbed spas and installed gas lines. Toward the end of 1982 and beginning of 1983, Michael went to work at Lenny's Plumbing, where he worked until the end of 1987.

At the end of 1987, Michael began working at Milliken & Michaels, Inc., a company owned by his brother-in-law, Michael Sanderson (hereinafter sometimes referred to as Sanderson). Before then, Michael had been living at his parents' house. When he began working for Sanderson, he moved into Sanderson's guest house.

At the end of 1989, Michael began operating his own plumbing business, doing business as Michael Downing Plumbing Co., hereinafter sometimes referred to as the plumbing business. Michael continued to conduct the plumbing business as a sole proprietor during the years in issue.

Michael first had Social Security earnings in 1979, in the amount of $913. This dropped to $287 in 1980, and zero in 1981. In 1982 when he was graduated from high school, he had Social Security earnings of $5,246. His Social Security earnings increased each year until 1989, when they reached $21,778. His 1990 and 1991 Social Security earnings were $1,660 and $5,759, respectively. Michael's Social Security earnings from 1979 through 1991 totaled $114,358.

B.   Sandra's Background

Sandra was born in 1960; she was graduated from high school in 1978. At some point, she completed a semester of college. In 1979, Sandra married Gary Rucker, hereinafter sometimes referred to as Rucker. They had two children: Rachel, born in 1983, and Sean, born in 1985. Sandra and Rucker separated in 1987; their divorce became final in 1989. Rucker paid to Sandra $4,200 of child support in cash in each year in issue.[5]

---

[5]   The parties stipulated that these payments were in cash in 1994 and 1995. On answering brief, petitioners contend that $2,800 of the 1995 payments was by check. Although petitioners' contentions are presented in great detail, (1) petitioners do not direct our attention to any evidence in the record that supports their contentions (see Rule 143(b)), and (2) petitioners do not ask to be relieved from the conclusive effect of the parties' stipulation that the 1995 payments were in cash (see Rule 91(e)). Our findings are in accord with the parties' stipulations; petitioners' contrary contentions are rejected.

During the years in issue, Sandra worked as a clerk at LCR Corporation, a plumbing supply house, where she earned $17,877 in 1994 and $17,700 in 1995.

Sandra had Social Security earnings at least as far back as 1976. Her Social Security earnings increased from $781 in 1976 and $434 in 1977, to $8,700 in 1982. Her Social Security earnings then declined, reaching zero in 1987. Thereafter, Sandra's Social Security earnings varied greatly from one year to the next. Sandra's Social Security earnings for 1976 through 1995 totaled $142,902.

C.   The Marriage Contract

Sandra and Michael met in December 1988. On July 14, 1989, they were married in St. Tammany Parish, Louisiana. Louisiana is a community property State.

Before their marriage, Sandra and Michael entered into a marriage contract (see infra note 16), which made them "separate in property". One of the reasons they did so was, on the advice of Sandra's divorce attorney, to prevent Rucker from aggregating Sandra and Michael's income in an attempt to reduce or eliminate Rucker's child support payment obligations. Petitioners executed the marriage contract on July 12, 1989; on July 14, 1989, the marriage contract was "filed for registry" in the conveyance records of St. Tammany Parish, where petitioners then resided.

The marriage contract provides as follows:

- 11 -

I.

The intended husband and wife shall be separate in property, therefore, neither of them shall be liable for the debts contracted by the other, either before or during their marriage;

The intended wife shall have the free and exclusive enjoyment of her separate property, and the full administration thereof, without the assistance of her husband.

II.

All property and effects of the said husband and wife, whether owned by him or her at the time of the celebration of said intended marriage, or acquired during said marriage, are hereby declared to be separate property, and that of the wife, separate and paraphernal property, and they and each of them do hereby expressly reserve to themselves individually the entire administration of their respective particular movable and immovable property, and the respective free enjoyment of each of their revenues.

On February 2, 2000, the marriage contract was "filed for registry" in the conveyance records of Jefferson Parish, Louisiana.

D.  The Plumbing Business

Michael generally worked alone in the plumbing business.  If he needed help, then he hired independent contractors.  Sandra handled all the bookkeeping for the plumbing business.  She wrote out the invoices and mailed them to customers, paid the bills, organized the records, did the banking, and submitted figures to petitioners' C.P.A. for use in preparing petitioners' tax returns.  The plumbing business was on the cash basis for 1994 and 1995.  Sandra computed gross income for the years in issue by

adding the invoices for the work that Michael had completed each month, and then adding the monthly totals.  The invoices totaled $68,757 for 1994 and $88,502 for 1995.

On the Schedules C for the plumbing business, Michael reported 1994 gross receipts of $68,758 and 1995 gross receipts of $82,721.  On answering brief, petitioners concede that Michael should have reported 1995 gross receipts of $88,502--$5,781 more than Michael in fact reported.  Supra note 3.

Table 1 sets forth the amounts of the Forms 1099 issued to the plumbing business for 1994 and the amounts of the corresponding invoices that Sandra prepared.

Table 1

| Customer | Form 1099 Amounts | Invoice Amounts |
|---|---|---|
| Randy Bolnar | $1,080 | $300 |
| Walter Martinolich | 4,062 | 2,855 |
| Renard J. Falcon Plumbing | 5,492 | 864 |
| Sizeler Property | 1,010 | 1,641 |
| Bayona Corp. | 3,960 | 2,285 |
| Metro Bank | 1,392 | 1,180 |
| Southern Foods Group | 9,283 | 9,213 |
| Totals: | 26,279 | 18,338 |

Table 2 sets forth the amounts of the Forms 1099 issued to the plumbing business for 1995 and the amounts of the corresponding invoices that Sandra prepared.

Table 2

| Customer | Form 1099 Amounts | Invoice Amounts |
|---|---|---|
| Lemaire | $4,929 | $5,576 |
| Southern Foods | 14,396 | 14,396 |
| R. L. Falcon | 8,983 | 10,403 |
| Junior League | 684 | 684 |
| A-Z Home | 1,185 | 1,185 |
| Vino Vino | 1,790 | 1,790 |
| Metro Bank | 1,281 | 1,281 |
| Sizeler | 1,171 | 1,218 |
| Bayona | 1,941 | 3,438 |
| Maurice's | 26,361 | 26,439 |
| Totals: | 62,721 | 66,410 |

E.   Personal Finances

1.   The Houses

Michael did not own any realty before he married Sandra. On October 3, 1991, he bought a house for $65,000 on Newman Avenue (hereinafter sometimes referred to as the Newman property) in Metairie, Jefferson Parish.  Michael's uncle gave $7,000 to him for a downpayment; Michael financed the remainder through Sanderson at 12 percent interest.  The monthly payment was $702.10.  The act of sale for the Newman property states, in pertinent part, as follows:

> MICHAEL J. DOWNING, a person of the full age of majority and resident of the Parish of Jefferson,[6] State of Louisiana,

---

[6]  The parties do not deal with the question of when petitioners moved their legal residence from St. Tammany Parish to Jefferson Parish, except that they stipulate that "During * * * 1994 and 1995, petitioners were married and residing

(continued...)

who declared under oath unto me, Notary, that he has been married but once and then to Sandra Martinolich Downing with whom he lives and resides; from whom he is separate in property by virtue of a marriage contract which is recorded in the Parish of Jefferson, in the conveyance records; * * *

The marriage contract was attached to the act of sale, which was filed in the conveyance records of Jefferson Parish on October 8, 1991.[7]

Petitioners' renovation work on the Newman property, included painting, roof, carpeting, and doors. On November 15, 1993, Michael sold the Newman property for $93,500. The check for the net proceeds from this sale, in the amount of $31,307.06, was made out solely to Michael. Petitioners spent $1,600 to $2,000 of this amount before January 1, 1994 and the remainder of the $31,307.06 by the end of 1994.

On March 24, 1995, Michael bought for $180,000 a house on Metairie Court Parkway (hereinafter sometimes referred to as the Metairie Court property) in Jefferson Parish. The Metairie Court property has been petitioners' residence since March 1995. Michael made a downpayment of $5,000 and financed the remainder initially through Mark Margavio and then through Sanderson at 10

[6](...continued)
together in Jefferson Parish, Louisiana".

[7] The parties stipulated that this filing was "in the conveyance records of St. Tammany Parish". However, on brief the parties' statements are to the effect that this Oct. 8, 1991, filing of the Newman property act of sale, with marriage contract attached, was in the Jefferson Parish conveyance records. Also, the Newman property was in Jefferson Parish. Under the circumstances, we conclude that the parties' stipulation on this point was in error and our finding reflects that conclusion rather than the parties' stipulation.

percent interest.  The mortgage payment was $1,880.56 per month.

The 1995 mortgage payments were made by checks signed by Sandra

drawn on Premier Bank account number 5101023648.  See infra table

5.  The interest portion of these 1995 mortgage payments

aggregated $10,133.  See supra note 2, as to respondent's

concessions.

Both the act of sale and the mortgage on the Metairie Court

property were recorded in the Jefferson Parish conveyance records

on March 28, 1995.  Unlike the act of sale for the Newman

property, the Metairie Court property act of sale did not have

attached to it a copy of the marriage contract.  Rather, the

Metairie Court property act of sale states as follows:

> MICHAEL JOSEPH DOWNING, a person of the full age of majority
> and a resident of the Parish of JEFFERSON, State of
> LOUISIANA, who, declared unto me, Notary, that he has been
> married but once and then to Sandra Martinolich, with whom
> he is presently living and residing, and with whom he is
> separate in property by virtue of a marriage contract dated
> July 12, 1989, and annexed to act recorded as Act No. 91-
> 44488, in the Parish of Jefferson, Louisiana, [the Newman
> property act of sale]
>
> Mailing Address:  2117 METAIRIE COURT PARKWAY, METAIRIE, LA
> 70001
>
> here present accepting and purchasing for himself, his heirs
> and assigns, and acknowledging due delivery and possession
> thereof, all and singular the following described property
> to-wit:

The Metairie Court property mortgage includes a similar

reference; the mortgage also does not have attached to it a copy

of the marriage contract.

2. <u>The Vehicles</u>

On December 6, 1994, Michael bought a new Ford F250 truck for the plumbing business.  He paid $2,100 in cash and financed the remaining $22,261.30 at an interest rate of 9.9 percent, with monthly payments of $471.83.  In 1995, petitioners made payments on this loan totaling $5,662.  Of this total, petitioners paid $1,200 by check and $4,462 in cash.  See <u>supra</u> note 2, as to respondent's concessions.  Michael continued to use the truck for business purposes in 1995.

On August 15, 1995, Michael bought a 1993 500SL Mercedes-Benz for $85,311.  He did not make a downpayment.  He financed the car at an interest rate of 13.25 percent, with monthly payments of $1,449.73.

On September 1, 1995, Michael bought a 1994 C2 3.6 Porsche for $108,630.61.  Again, he did not make a downpayment.  He financed the car at an interest rate of 13.1 percent, with monthly payments of $1,775.26.

A Mercedes-Benz that had been bought by one or both of the petitioners in 1992 or 1993, was stolen in 1994 or 1995.

3. <u>Cash Advances</u>

On May 30, 1994, petitioners withdrew a $2,500 cash advance from their American Express Optima account.  On August 12, 1994, petitioners withdrew a $3,000 cash advance from their First USA Visa account.  On March 21, 1995, petitioners deposited a $5,000

convenience check issued by AT&T Universal Gold MasterCard into one of their personal checking accounts.

F.    Tax Returns

Petitioners timely filed "married filing separate" income tax returns for both of the years in issue.  In each of these tax returns, the respective petitioner correctly showed that petitioner's spouse's name and Social Security number at the appropriate places.  Their tax returns for 1989 through 1993 also were "married filing separate".

For 1994 and 1995 petitioners reported adjusted gross income and total tax as shown in table 3.

Table 3

| Year | Michael Adjusted Gross Income | Total Tax | Sandra Adjusted Gross Income | Total Tax |
|------|------|------|------|------|
| 1994 | $8,360 | $1,314 | $17,877 | $1,068 |
| 1995 | 8,926 | 1,456 | 17,700 | 946 |

On the 1994 and 1995 Schedules C, Michael reported gross receipts, cost of goods sold, expenses, and net profit for the plumbing business as shown in table 4.

Table 4

| Year | Gross Receipts | Cost of Goods Sold | Expenses | Net Profit |
|------|------|------|------|------|
| 1994 | $68,758 | $44,780 | $14,982 | $8,996 |
| 1995 | 82,721 | 54,141 | 18,975 | 9,605 |

The tax returns for both petitioners were prepared by Jeanne S. Duhé (hereinafter sometimes referred to as Duhé), a C.P.A.

G. <u>The Audit</u>

Revenue Agent Adoraliese Klimkiewicz (hereinafter sometimes referred to as Klimkiewicz) conducted the examination of petitioners' tax returns. She initially examined only Michael's 1994 tax return, but about the end of 1996 or the beginning of 1997, she expanded the examination to include Michael's 1995 tax return. Klimkiewicz did not begin to audit Sandra's tax returns until sometime between March and May of 1997.

Klimkiewicz' first meeting with petitioners or their representatives was on or about June 19, 1996, when Klimkiewicz met with Sandra in Duhé's office. At Klimkiewicz' request, Sandra brought to the meeting both business and personal records, the major records being the following: (1) All the 1994 invoices from the plumbing business that were reported on Michael's 1994 tax return; (2) adding-machine tapes categorized by month; (3) Forms 1099; (4) the plumbing business and personal bank account statements; (5) some credit card statements; and (6) some automobile insurance documents. At that meeting, in response to Klimkiewicz' question about petitioners' cash on hand at the beginning of 1994, Sandra said that they would have had cash on hand from the sale of the Newman property, and that they probably had spent all the Newman property proceeds by the end of 1994.

On July 17, 1997, Klimkiewicz met with both petitioners and their then representative, Sean Dawson, at Dawson's office. Both

petitioners told Klimkiewicz that there was a box in which the proceeds from the Newman property and other cash savings were kept, and that only Michael had access to this box. Michael told Klimkiewicz that he alone had a key to the box, and that he alone knew the amount of cash in the box. He also provided to Klimkiewicz a typed statement he had prepared, indicating that, as of January 1, 1994, he had accumulated a cash hoard of roughly $180,000 in the box. When Klimkiewicz asked petitioners at this meeting how much cash remained in the box at that time, Michael told her that, while he did not know the exact amount of cash remaining in the box, she could determine the amount by subtracting out--presumably from the roughly $180,000 cash hoard that he said at this meeting had been in the box at the beginning of 1994--the amount that she was proposing as an understatement; the resulting amount would be the amount of cash remaining in the box as of that date. At trial, Michael testified that there was roughly $60,000 to $70,000 in the box at the beginning of 1994, and that he ran out of money in the box a year after he bought the Metairie Court property.

Also at the July 1997 meeting, Michael provided to Klimkiewicz a written statement in which he indicated that he did not use any of his cash savings from the time he was 12 until the beginning of 1994.

By November 1997, Klimkiewicz was no longer on the case, having been succeeded by Mia Sylve.

H.    Bank Deposits

Petitioners maintained four bank accounts in two separate institutions; both petitioners were signatories on each of these accounts.  Neither petitioner maintained a separate account (i.e., an account as to which that petitioner, but not the other petitioner, was a signatory) during the years in issue.

Table 5 shows petitioners' aggregate deposits into each account, by account number, in each year in issue.

Table 5

| Account | 1994 | [2]1995 |
|---|---|---|
| 1225725403 | $8,874 | $5,787 |
| 5101046656 | 48,335 | 114,702 |
| 1642324806[1] | 8,207 | N/A |
| 5101023648 | 64,936 | 95,409 |
| Total Deposits | 130,352 | 215,898 |

[1] This account was closed in April 1994.

[2] Of the total 1995 deposits in these listed accounts, $200, $5,000, and $31,475, respectively, were in cash.

The bank accounts listed in table 5 are hereinafter sometimes referred to collectively as the listed accounts.

All four of the listed accounts were checking accounts.  The first and third of the listed accounts were in the Jefferson Guaranty Bank; the second and fourth were in the Premier Bank. The first and second of the listed accounts were business

accounts entitled "Michael Downing Plumbing Co."; the third and fourth were personal accounts.

Table 6 sets forth the aggregate of the balances in the listed accounts at the specified dates.

Table 6

| Dates | Aggregate Amounts |
|-------|-------------------|
| Jan. 1, 1994 | $3,584 |
| Dec. 31, 1994 | 2,759 |
| Dec. 31, 1995 | 1,113 |

## I. Bank Deposits Method Omitted Income

Tables 7 (for 1994) and 8 (for 1995) set forth our findings as to the bank deposits method for determining unreported income.[8] The column headed "Respondent" takes into account respondent's concessions, by stipulation or otherwise, including those made in the course of proceedings occurring after the completion of the briefing process.[9] The columns headed "Court--Fraud" and "Court--Nonfraud" represent, respectively, our findings based on the clear-and-convincing-evidence burden of

---

[8] Although both sides refer to respondent's analysis as "the bank deposits method", it appears that the better term is "the bank deposits and cash expenditures method". See generally United States v. Abodeely, 801 F.2d 1020, 1023-1024 (8th Cir. 1986). For convenience, we follow the parties' terminology and refer to it as the bank deposits method.

[9] In the notices of deficiency respondent determined that unreported Schedule C gross receipts were $28,857 for 1994 and $144,369 for 1995. As tables 7 and 8 show, respondent's position now is that unreported Schedule C gross receipts were $24,425 for 1994 and $84,085 for 1995.

proof and our findings based on the preponderance of the evidence.

Table 7--1994

| Item | Respondent | Court--Fraud | Court--Nonfraud |
|---|---|---|---|
| Total listed accounts deposits | $130,352 | $130,352 | $130,352 |
| Nontaxable transfers | (12,142) | (12,142) | (12,142) |
| Gifts | (265) | (265) | (265) |
| Expense checks from LCR; rebates | (185) | (185) | (185) |
| Business expenditures--cash | 25,612 | 25,612 | 25,612 |
| Personal living expenditures--cash | 6,154 | 4,054 | 4,054 |
| Opening listed accounts balances | (3,584) | (3,584) | (3,584) |
| Closing listed accounts balances | 2,759 | 2,759 | 2,759 |
| Nontaxable cash | (39,507) | (44,907) | (40,507) |
| Net wages--Sandra | (16,011) | (16,011) | (16,011) |
| Correct Sched. C gross receipts | 93,183 | 85,683 | 90,083 |
| Reported Sched. C gross receipts | 68,758 | 68,758 | 68,758 |
| Unreported Sched. C gross receipts | 24,425 | 16,925 | 21,325 |

Table 8--1995

| Item | Respondent | Court--Fraud | Court--Nonfraud |
|------|-----------|--------------|-----------------|
| Total listed accounts deposits | $215,898 | $215,898 | $215,898 |
| Nontaxable transfers | (35,275) | (35,275) | (35,275) |
| Returned checks (NSF) | (7,132) | (7,132) | (7,132) |
| Gifts | (502) | (502) | (502) |
| Expense checks from LCR; rebates | (228) | (228) | (228) |
| Business expenditures--cash | 4,136 | 4,136 | 4,136 |
| Personal living expenditures--cash | 11,618 | 6,900 | 6,900 |
| Opening listed accounts balances | (2,759) | (2,759) | (2,759) |
| Closing listed accounts balances | 1,113 | 1,113 | 1,113 |
| Nontaxable cash | (4,200) | (4,200) | (4,200) |
| Net wages--Sandra | (15,913) | (15,913) | (15,913) |
| Corrected Sched. C gross receipts | 166,756 | 162,038 | 162,038 |
| Reported Sched. C gross receipts | 82,721 | 82,721 | 82,721 |
| Unreported Sched. C gross receipts | 84,035 | 79,317 | 79,317 |

The parties' disputes about other Schedule C items, and about Schedule A items, all have been resolved by stipulations, concessions, and deemed concessions. These resolutions are to be given effect in the computations under Rule 155.

Respondent has shown by clear and convincing evidence as to each year in issue that: (1) Michael understated his plumbing business Schedule C gross receipts; (2) this understatement resulted in an underpayment of tax; and (3) some part of this underpayment of tax was due to Michael's fraud.

OPINION

I. Summary; Conclusions

Because of its impact on the rest of the case, we first deal with the parties' dispute as to whether each petitioner was required to report on that petitioner's separate Federal income tax return in accordance with the splits ordinarily required by Louisiana's community property regime. We agree with petitioners that they were not so required. Respondent conceded that, if we so held, then Sandra had no deficiencies and no additions to tax; that concession will be given effect in our decision.[10]

We then consider the fraud issue. We agree with respondent that respondent has shown by clear and convincing evidence that Michael has an underpayment of tax for each year and that part of each year's underpayment is due to Michael's fraud. Our redeterminations as to amounts agree largely, but not entirely, with respondent's determinations as modified by the parties' stipulations and respondent's concessions.

---

[10] Sandra nevertheless remains a party in the instant case. DeLucia v. Commissioner, 87 T.C. 804 (1986).

## II. The Marriage Contract

Respondent contends that, during the years in issue, the marriage contract was not effective toward third persons because petitioners failed to properly record it. Respondent also contends that, even if the marriage contract was properly recorded, it was nevertheless not effective because petitioners did not conduct their financial affairs in accordance with the contract's terms.

Petitioners maintain[11] that: (1) The marriage contract was properly recorded at all relevant times; and (2) they complied with the terms of their marriage contract.

We agree with petitioners that the marriage contract was properly recorded at all relevant times, and that it was effective during the years in issue.[12]

_____

[11] Petitioners also maintain that respondent is not a third person protected by the filing requirements of La. Civ. Code Ann. art. 2332 (West 1985). Because we conclude that petitioners' marriage contract was properly recorded at all relevant times, we need not address this contention.

[12] It was apparent before the trial that petitioners' contentions on this issue, if successful, would amount to a victory for Sandra but would expose Michael to the potential of an increased deficiency. This conflict between the individual interests of Sandra and Michael was noted before the trial. The Court discussed this matter with counsel for both sides and both petitioners, ensemble. On the basis of the discussion in chambers and the statements on the record, the Court is satisfied (a) that petitioners' counsel had previously explained the conflict to both petitioners and it was again explained in chambers, (b) that both petitioners previously understood the matter and that both petitioners understood the matter

(continued...)

Both questions before us appear to be matters of first impression, and both sides maintain that our determination as to the role of the marriage contract depends on Louisiana law. In the absence of any Louisiana court opinion resolving these matters, we make our own analysis of what Louisiana law provides. See Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967).

We consider first whether a marriage contract, which was properly filed for registry in the parish in which petitioners were domiciled at the time of this filing, must also be filed for registry in a different parish for the marriage contract to be effective toward third persons as to movables,[13] if petitioners have in the meanwhile become domiciled[14] in that different parish.

---

[12](...continued)
immediately before and during the trial, and (c) that both petitioners intended that their counsel (1) continue to represent both of them simultaneously in the instant case and (2) continue to present in the instant case contentions which exposed Michael to the potential of increased liabilities. See Rule 24(g)(2).

[13] Both sides treat the matter before us as being controlled entirely by the rules as to movables; under the circumstances, we limit our determinations to the dispute that the parties present.

[14] The Louisiana statutory term is "domiciled". From time to time we refer to "residing", or to "moving". We intend thereby to deal only with residence that constitutes domicile, and with moving that constitutes changes of domicile, within the meaning of that term in art. 2332.

Unless indicated otherwise, all article references are to the articles of the Louisiana Civil Code Annotated (West 1985).

A.  General Rules; Statutes

Louisiana law provides that "A matrimonial regime[15] may be legal, contractual, or partly legal and partly contractual." Art. 2326.  Under Louisiana law, "The legal regime of community of acquets and gains applies to spouses domiciled in this state" (art. 2334), and "Each spouse owns a present undivided one-half interest in the community property", art. 2336.  As a result, a Louisiana married person under the legal regime is taxable under Federal law on one-half the earnings of his or her spouse. United States v. Mitchell, 403 U.S. 190 (1971); see Case of Hamner, 411 So.2d 567, 568-569 (La. App. 1st Cir. 1982), revd. on a different issue 427 So.2d 1188 (La. 1983).

The "legal" regime is commonly referred to as "community property".  The "contractual" regime alternative referred to in article 2326, is authorized in article 2328, as follows:

> A matrimonial agreement is a contract establishing a regime of separation of property or modifying or terminating the legal regime.  Spouses are free to establish by matrimonial agreement a regime of separation of property or modify the legal regime as provided by law.  The provisions of the legal regime that have not been excluded or modified by agreement retain their force and effect.

Under article 2331--

---

[15]  Art. 2325 provides the following definition:

> A matrimonial regime is a system of principles and rules governing the ownership and management of the property of married persons as between themselves and toward third persons.

A matrimonial agreement may be executed by the spouses before or during marriage. It shall be made by authentic act or by an act under private signature duly acknowledged by the spouses.

Under article 2336--

the spouses may, without court approval, voluntarily partition the community property in whole or in part. In such a case, the things that each spouse acquires are separate property. The partition is effective toward third persons when filed for registry in the manner provided by Article 2332.

Article 2332, entitled "Effect toward third persons", provides in

entirety as follows:

A matrimonial agreement, or a judgment establishing a regime of separation of property is effective toward third persons as to immovable property, when filed for registry in the conveyance records of the parish in which the property is situated and as to movables when filed for registry in the parish or parishes in which the spouses are domiciled.

B. Effect of the Marriage Contract

The parties initially dispute whether the marriage contract,[16] which concededly was "filed for registry" in St. Tammany Parish on July 14, 1989, also had to be "filed for registry" in Jefferson parish at some point before the years in

---

[16] Both sides use the term "marriage contract", rather than the statutory term "matrimonial agreement". For convenience, we will follow the parties' terminology.

issue,[17] in order to be effective toward third persons as to movables during the years in issue.[18]

The parties agree that this is a matter of first impression under Louisiana law and present this matter to us for decision in the instant case. Both sides direct our attention to 16 Spaht & Hargrave, Louisiana Civil Law Treatise, Matrimonial Regimes (West 2d ed. 1997), hereinafter sometimes referred to as 16 Spaht & Hargrave.[19]

---

[17] Both sides agree that the marriage contract was "filed for registry" in Jefferson Parish on Feb. 2, 2000, but this filing is not effective toward third persons for the years in issue.

[18] The instant case does not present any question or contention as to whether--

(1) the marriage contract resulted in a matrimonial regime that was partly legal and partly contractual (art. 2326);

(2) the marriage contract involved matters prohibited by public policy (art. 2329);

(3) the marriage contract violated any of the limits of contractual freedom set forth in art. 2330 or established under any other Louisiana law;

(4) the marriage contract violated any of the requirements as to form set forth in art. 2331 or established under any other Louisiana law; or

(5) Sandra's efforts on behalf of the plumbing business result in a recognition of some amount of income to Sandra because of the operation of art. 2368.

[19] Petitioners' citations are to the 1989 edition; the texts and section numbers of the matters petitioners referred to appear to be unchanged in the 1997 edition, but the page numbers are different.

Article 2332 on its face requires that the filing be in the parish of the property's situs as to immovables and in the parish or parishes of the spouses' domicile as to movables. The 1989 filing in St. Tammany Parish complied with the requirements as to movables in 1989. Although Louisiana law permits a filing of a marriage contract that applies to some movables but not to others, the marriage contract involved in the instant case applied by its terms to all future acquired movables and to the fruits of all their separate properties. Thus, respondent has not suggested that any later filings would have been required under article 2332 merely because of the passage of time or because the movables relevant to 1994 and 1995 did not exist at the time of the 1989 St. Tammany Parish filing. See, e.g., article 2339, relating to fruits of movables.

The statute does not provide, in terms, that a <u>change in domicile</u> requires a <u>change in filing situs</u> as to movables, where there already has been a properly sited filing. Article 2332 does refer to "the parish <u>or parishes</u> in which the spouses are domiciled." (Emphasis added.) However, comment (b) to article 2332 suggests that the words "or parishes" merely reflects a recognition that spouses might be domiciled in separate parishes, as a result of the repeal of Louisiana law which had provided that "A married woman has no other domicile than that of her

husband." 16 Spaht & Hargrave, sec. 8.5, n.9 and associated text.

We have not been directed to, and our research has not disclosed, anything in the legislative history of the enactment of article 2332 that suggests that the words "or parishes" were intended to require new filings in the circumstances of the instant case.[20]

Respondent raises the concern that a ruling in favor of petitioners--

> would mean that third parties would have to search the conveyance records of each of the 64 parishes in the State of Louisiana in order to assure themselves that the parties had not filed a matrimonial agreement that would affect the third parties' right as to petitioners' movables. * * * Respondent submits that this result would be completely contradictory to the purpose of La. Civ. Code art. 2332 (West 1985), which provides in a clear and straightforward

---

[20] Spaht and Hargrave note as follows (16 Spaht & Hargrave, sec. 8.5):

Indeed, when the legislation was drafted, central statewide registry of matrimonial agreements was part of the proposal, rendering unnecessary a continuing registration as spouses moved about the state. That proposal was defeated, however.[10] The result is that in a mobile society, third persons are not well protected with respect to matrimonial agreements that were contracted when the spouses were domiciled elsewhere. In a crucial situation, a search of the records in 64 parishes would be required to ascertain with certainty that no such agreement was recorded in the state.

[10] K. Spaht and C. Samuel, Equal Management Revisited: 1979 Legislative Modifications of the 1978 Matrimonial Regimes Law, 40 La. L. Rev. 84, 106; La. H.B. No. 802, 5th Reg. Sess. (1979).

fashion that with respect to movables, to be effective as to third parties, the agreement must be filed in the parish or parishes where the spouses are domiciled.  The most sensible reading of this article is that third parties are <u>not</u> required to research the records of all 64 parishes, but rather are entitled to rely on what is or is not filed for registry in the records of the parish where the spouses are domiciled.

However, respondent overlooks the burdens that respondent's rule might impose on spouses who move.  Would respondent's rule require that a refiling be accomplished before or on the date of domicile change, or would there be a standard grace period after the domicile change?  Who is better able to negotiate their respective burdens, third parties who look to assets to satisfy existing debts or to assure payments of prospective advances of funds or credit, or spouses who may not be represented by counsel and may be surprised to learn that a filing they had thought was good-until-revoked-or-modified, had in fact been rendered ineffective.  In this regard, the same increase in mobility that creates the danger of imposing more burdens on third persons also creates the danger of removing more protections from unsophisticated spouses.

We do not mean to make light of the concerns respondent describes.  We suggest that the weighing of these and contrary concerns are properly within the province of Louisiana's lawmaking structure.  We decline to go further than what the statute in terms prescribes.  We conclude that, under art. 2332,

the marriage contract was properly recorded and that it was effective during the years in issue.

We must note, however, that the foregoing discussion, in response to the parties' focus, deals with the rights of third persons, as against the spouses' movables. However, the question that we must ultimately rule on is not a matter of what assets respondent may look to in order to satisfy the liabilities of either or both petitioners, but rather whether each petitioner has a present undivided interest in the earnings of the other spouse, for it is that present undivided interest that is the foundation of the community property Federal income tax rules. United States v. Mitchell, 403 U.S. 190 (1971). In that light, we conclude that Spaht's and Hargrave's analysis which closes the cited section in their treatise (16 Spaht & Hargrave, sec. 8.5) is particularly illuminating.

> Under Civil Code Article 2332, matrimonial agreements do not have to be recorded to be valid. It may well suit a couple to deal with third persons as though they were under the legal community regime, especially as to contracting debts and alienating assets, but to have a different regime as between themselves. Some persons may simply want to keep such matters private. Whatever the reason, there is nothing to require them to make such agreements public so long as third persons are not injured in the process.[21] Their heirs, of course, would not qualify as protected third persons because they would be successors.[22] It is required, however, that the agreement be in writing and that it be either "made by authentic act or by an act under private signature duly acknowledged by the spouses."[23]

---

[21] Comment, Marital Property Agreements--Being Creative with the New Legislation, 43 La. L. Rev. 159 (1982).

[22] La. Civ. Code arts. 880 et seq., 3506(28); La. R.S. 9:2722.

[23] La. Civ. Code art. 2331.

The existence of the marriage contract has been conclusively established.  The text of the marriage contract has been conclusively established.  On the basis of the record in the instant case, we conclude that respondent has not been injured.

C.  Failure To Conform With the Contract's Terms

Respondent contends in the alternative that petitioners' failure to conform to the terms of their marriage contract rendered the contract ineffective.

Respondent has not directed our attention to any Louisiana law, or to any other authority for that matter, that specifically addresses this issue.  In fact, respondent acknowledges on brief that respondent was unable to find any case that directly addresses this issue.  In our own search, we likewise have been unable to find any authority that supports respondent's contention.  Nevertheless, we need not decide whether in the abstract spouses' failure to conform to the terms of their marriage contract can render it ineffective because, even if respondent is correct, we conclude that petitioners substantially conformed to the terms of their marriage contract.

In evaluating the evidence in the instant case, we are mindful that "'agreements legally entered into have the effect of laws on those who form them.  R.C.C. Art. 1901 * * * Arkansas

Fuel Oil Corporation v. Puccio, 141 So. 2d 516, [520 (La App.
1962)]'". Morgavi v. Mumme, 270 So. 2d 540, 543 (La. 1972)
(quoting Succession of Caine v. Tanho Land and Cattle Co., 198
So. 2d 439, 444 (La. App. 1967)). "[C]ourts are bound to give
effect to all contracts according to the true intent of the
parties when the language is clear and leads to no absurd
consequences." Stack v. De Soto Properties, Inc., 59 So. 2d 428,
430 (La. 1952).

Respondent asserts on opening brief that a court may
consider

> evidence on the extent to which the parties to the
> matrimonial agreement are fulfilling the stipulations of the
> contract, i.e., whether or not and to what extent the two
> actually share income notwithstanding the existence of the
> matrimonial agreement. Knoepfler v. Knoepfler, 553 So.2d
> 1031, 1032 (La. App. 1989).

Respondent argues that the evidence in the instant case clearly
shows that petitioners did not comply with the terms of their
marriage contract because (1) petitioners commingled all their
income into four joint checking accounts, (2) petitioners had
signature authority on all bank accounts, (3) petitioners
transferred funds between the business and personal checking
accounts; and (4) petitioners paid business expenses from
personal accounts, and vice versa.

Petitioners reply that they "merely pooled their resources
to provide for the expenses of the marriage". They point to the
fact that they filed separate tax returns for each year in issue

and that they bought "all their [large] property and other assets" separately as evidence that they did, indeed, conform to the terms of their marriage contract.

We agree with petitioners' conclusions for the following reasons.

Firstly, because respondent relies on Knoepfler v. Knoepfler, supra, and that case has some surface similarities to the instant case, it may be appropriate to examine more deeply the setting of Knoepfler and the expressed rationale of the Louisiana courts. Knoepfler v. Knoepfler, supra, was a dispute about the level of required child support obligations, the parents having divorced each other and each having married a new spouse. The father had been ordered to pay child support. The father moved to decrease the amount of child support; the mother responded with a petition to increase the amount of child support. At the trial court hearing, the father:

> introduced into evidence the matrimonial agreement in which Mr. Knoepfler and his second spouse established a separation of property regime. The [trial] court disallowed testimony as to the intent behind the agreement. The court stated that he was "not considering the [second] wife's income." 553 So. 2d at 1032.

The trial court decreased the amount of child support. The mother appealed, assigning as error (1) the trial court's refusal to consider the income of the father's second spouse and (2) the trial court's conclusion that the evidence showed a change in circumstances which could justify the reduction. 553 So. 2d at

1032-1033. The appellate court reversed the reduction of child support, agreeing with the mother on the second assignment of error, relating to changes in circumstances. 553 So. 2d at 1033. However, the appellate court upheld the trial court's refusal to take into account the income of the father's second spouse, based on the evidence in the record. The appellate court stated as follows (553 So. 2d at 1032):

> We note, however, that our decision in Alt [v. Alt, 453 So. 2d 400, 402 (La. App. 4th Cir. 1983),] does not in any way preclude the taking of evidence on the extent to which the parties to the matrimonial agreement are fulfilling the stipulations of the contract, i.e., whether or not and to what extent the two actually share income notwithstanding the existence of the matrimonial agreement. To rule otherwise would enable a parent to circumvent his child support obligation by executing, but never giving effect to, a marriage contract establishing a separation of property regime.

The appellate court explained the suggestion permitting inquiry into "the extent to which the parties to the matrimonial agreement are fulfilling the stipulations of the contract" as being necessary in order to stop a parent from circumventing his child support obligation. The appellate court did not take the position that such inquiries are proper to test all marriage contracts. In the instant case there is not any contention that the marriage contract circumvents any obligation that either petitioner may have toward respondent or any other person that respondent seeks to protect.

The appellate court in Knoepfler did not describe the inquiry in terms of the validity of the marriage contract (i.e., whether the spouse owns a present undivided interest in the earnings of the other spouse), but only whether the other spouse's income ought to be taken into account in applying Louisiana's child support laws.  553 So. 2d 1032-1033.  In the instant case, the only inquiry is as to the validity of the marriage contract in order to decide whether Sandra and Michael each had a present undivided interest in the earnings of the other.

Secondly, all of the opinions cited by respondent discuss commingling in terms of mixing separate property with community property, not separate property with separate property.  See, e.g., Thibodaux v. Thibodaux, 577 So. 2d 758 (La. App. 1st Cir. 1991).  Even so, those cases hold that depositing separate funds and community funds into the same bank account does not necessarily "extinguish the separate character of either the husband's or the wife's separate funds; only indiscriminate commingling, so that one cannot identify or differentiate among the funds, results in the account being deemed community." McMorris v. McMorris, 654 So. 2d 742, 746 (La. App. 1st Cir. 1995).  Thus, even when separate funds are mixed with community funds, it is only when those funds are "indiscriminately

commingled" such that they cannot be traced to their separate source that they are deemed community. <u>Curtis v. Curtis</u>, 403 So. 2d 56, 59 (La. 1981). Such treatment is consistent with the presumption of community property in Louisiana. See La. Civ. Code Ann. art. 2340 (West 1985).

Applying those holdings to the instant case, respondent argues that it is impossible to trace the funds petitioners used from their joint accounts back to the separate funds of either spouse because petitioners did not "make any effort to track payments on allegedly separate assets, * * * in order to establish what was paid for with separate funds." It is unclear from the record, however, whether petitioners were asked or even attempted to track the payments. Moreover, we do not think such tracking is required. Unlike in the cases cited above, the legal presumption that the spouses are living in community does not apply in the instant case because, as we concluded, <u>supra</u>, petitioners' marriage contract was properly recorded during the years in issue. See 16 Spaht & Hargrave sec. 4.7. Further, we are not deciding the character of the funds petitioners deposited into their joint accounts, but rather, we are deciding whether petitioners' asserted indiscriminate commingling of separate funds with other separate funds invalidates petitioners' marriage contract. We do not think it does.

<u>Thirdly</u>, the documents relating to the Newman property and the Metairie Court property list only Michael as the owner of

those properties.  While it is true, as respondent argues, that the fact that "property is in the name of only one spouse and there is a statement of paraphernality in the act of sale does not change" the presumption that "all property acquired during marriage is presumed to belong to the community", Cheramie v. St. Pierre, 382 So. 2d 1003, 1006 (La. App. 1st Cir. 1980), it is also true that "If the spouses are living under a separate property regime, the presumption does not apply."  16 Spaht & Hargrave, sec. 4.7.  Because we found, supra, that petitioners properly recorded their marriage contract, there is no applicable presumption that petitioners' property is community property. Thus, the facts that (1) only Michael's name was on the documents relating to petitioners' residences and (2) the documents of sale recite that Michael was "separate in property" from his wife support petitioners' contention that they were complying with the terms of their marriage contract.

Fourthly, we note that petitioners filed separate tax returns for the years in issue, using the filing status "married filing separate".  Respondent argues that the mere fact that petitioners filed separate tax returns does not prove that petitioners were separate in property under Louisiana law.  We agree.  This fact, however, is evidence that petitioners viewed and treated their respective earnings as their separate property.

In concluding that Louisiana property law determines ownership for purposes of Federal income taxation in the instant case, we are aware of our prior decisions holding that in some circumstances we would ignore State law as to property ownership. For example, we have held that a trust, valid under State law, may be treated as a nullity for Federal income tax purposes if it lacks economic reality. See Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980); Furman v. Commissioner, 45 T.C. 360, 364 (1966), affd. 381 F.2d 22 (5th Cir. 1967); see also Audano v. United States, 428 F.2d 251, 257-259 (5th Cir. 1970). In those cases, we looked at whether there were any economic changes to the donors other than changes to their Federal income tax liability. In Furman, we indicated that it was the "extreme case" where we would disregard for Federal income tax purposes the existence of a trust valid under State law. Furman v. Commissioner, 45 T.C. at 366.

In the instant case, petitioners entered into the marriage contract, among other reasons, to prevent Rucker from aggregating petitioners' incomes in an attempt to reduce or eliminate his child support obligations. Comparisons of Sandra's and Michael's Federal income tax returns plainly show that they are not under a community property marriage regime. This is not one of those "extreme cases" that calls for us to disregard a contract valid under State law for Federal income tax purposes.

We conclude that petitioners' marriage contract was effective during the years in issue.

We hold for petitioners on this issue.

### III.  Fraud

Respondent contends (1) that Michael underpaid his taxes for each year in issue, and (2) that all or part of his underpayments are due to fraud, and, thus, Michael is liable for the fraud penalties under section 6663.

Petitioners acknowledge that Michael may have underpaid his taxes for each year in issue, but maintain that any underpayment was not due to fraud because Michael lacked the requisite fraudulent intent.

We agree with respondent.

When respondent seeks to impose the penalty under section 6663,[21]  respondent has the burden of proof.  To carry this

---

[21]  SEC. 6663.  IMPOSITION OF FRAUD PENALTY

(a)  Imposition of Penalty.-- If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

(b)  Determination of Portion Attributable to Fraud.-- If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud.

burden for a year, respondent must prove two elements, as
follows:  (1) That Michael has an underpayment of tax for that
year, and (2) that some part of the underpayment is due to fraud.
See sec. 7454(a);[22] Rule 142(b); see, e.g., Carter v. Campbell,
264 F.2d 930, 936 (5th Cir. 1959); Stone v. Commissioner, 56 T.C.
213, 220 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106
(1969).[23]  Each of the elements must be proven by clear and
convincing evidence.  See DiLeo v. Commissioner, 96 T.C. 858, 873
(1991), affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner,
94 T.C. 654, 663-664 (1990).

For this purpose, respondent need not prove the precise
amount of the underpayment resulting from fraud, but only that
there is some underpayment and that some part of it is
attributable to fraud.  See, e.g., Lee v. United States, 466 F.2d
11, 16-17 (5th Cir. 1972);  Plunkett v. Commissioner, 465 F.2d
299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274.  In carrying
this burden, respondent may not rely on petitioners' failure to

---

[22]  SEC. 7454.  BURDEN OF PROOF IN FRAUD, FOUNDATION
          MANAGER, AND TRANSFEREE CASES.

     (a) Fraud.-- In any proceeding involving the issue
whether the petitioner has been guilty of fraud with intent
to evade tax, the burden of proof in respect of such issue
shall be upon the Secretary.

[23]  The elements of fraud under sec. 6663 are essentially
the same as those we considered under sec. 6653(b) of prior law.
See also Rhone-Poulenc Surfactants v. Commissioner, 114 T.C. 533,
547-548 (2000); Clayton v. Commissioner, 102 T.C. 632, 652-653
(1994); Houser v. Commissioner, 96 T.C. 184, 185 n.1 (1991).

meet their burden of proving error in respondent's determinations as to the deficiencies.  See, e.g., <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 700 (1989); <u>Habersham-Bey v. Commissioner</u>, 78 T.C. 304, 312 (1982), and cases cited therein.

Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. See <u>Estate of Stein v. Commissioner</u>, 25 T.C. 940, 959-963 (1956), affd. sub nom. <u>Levine v. Commissioner</u>, 250 F.2d 798 (2d Cir. 1958); <u>McLaughlin v. Commissioner</u>, 29 B.T.A. 247, 249 (1933).  A mere understatement of income does not establish fraud.  See <u>Estate of Mazzoni v. Commissioner</u>, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memos. 1970-144 & 1970-37; <u>Otsuki v. Commissioner</u>, 53 T.C. at 108.

In order to establish fraud as to Michael, respondent must show that Michael intended to evade taxes which Michael knew or believed were owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  See, e.g., <u>Grossman v. Commissioner</u>, 182 F.3d 275, 277 (4th Cir. 1999), affg. T.C. Memo. 1996-452; <u>Powell v. Granquist</u>, 252 F.2d 56, 60 (9th Cir. 1958); <u>Danenberg v. Commissioner</u>, 73 T.C. 370, 393 (1979); <u>McGee v. Commissioner</u>, 61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).  This intent may be inferred from circumstantial evidence, see <u>Powell v. Granquist</u>, 252 F.2d at 61; <u>Gajewski v. Commissioner</u>, 67 T.C. 181, 200 (1976), affd. without published

opinion 578 F.2d 1383 (8th Cir. 1978), including the implausibility of petitioners' explanations.  See Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986)(and cases cited therein), affg. T.C. Memo. 1984-601; Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court dated March 14, 1951.

A.   Underpayment

Respondent used the bank deposits method to determine Michael's income for the years in issue.  Supra note 8.  It is well settled that bank deposits are evidence of income where the deposits were made by the party charged with the income or to an account controlled by the party charged with the income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  The premise underlying the bank deposits method of income reconstruction is that, absent some explanation, a taxpayer's bank deposits represent income subject to income tax.  DiLeo v. Commissioner, 96 T.C. at 868.  The use of the bank deposits method of income reconstruction has long been sanctioned by the courts.  In using this method, respondent must take into account any nontaxable deposits or deductible expenses of which respondent has knowledge.  Id.

We have held that, where respondent has the burden of proof in a bank deposits case, e.g., where respondent has determined that a taxpayer has committed tax fraud, then--

Respondent can satisfy * * * [the] burden of proving the first prong of the fraud test, i.e., an underpayment, when the allegations of fraud are intertwined with unreported and indirectly reconstructed income in one of two ways. Parks v. Commissioner, 94 T.C. at 661. Respondent may prove an underpayment by proving a likely source of the unreported income. Holland v. United States, 348 U.S. 121 (1954); Parks v. Commissioner, supra at 661; Nicholas v. Commissioner, 70 T.C. * * * [1057,] 1066 [(1978)]. Alternatively, where the taxpayer alleges a nontaxable source, respondent may satisfy * * * [the] burden by disproving the nontaxable source so alleged. United States v. Massei, 335 U.S. 595 (1958); Parks v. Commissioner, supra at 661. [DiLeo v. Commissioner, 96 T.C. at 873.]

In the notices of deficiency, respondent determined that, in essence, every element of each year's underpayment was due to fraud. On brief, respondent's fraud contentions focus entirely on the unreported Schedule C receipts.

We consider the elements of the bank deposit analysis (supra tables 7 and 8), in order to determine whether, as to each year in issue, respondent has shown by clear and convincing evidence that there was unreported Schedule C income and that this produced an underpayment of tax.

(1)  Total Listed Accounts Deposits

The parties stipulated that the total bank deposits were $130,352 in 1994 and $215,898 in 1995.

(2)  Nontaxable Transfers

The parties stipulated that the nontaxable transfers were $12,142 in 1994 and not less than $35,275 in 1995.[24]

---

[24] Of this 1995 total, $29,275 was stipulated before trial,
(continued...)

Petitioners' only contentions as to the 1995 nontaxable transfers were among the items respondent conceded in the postbrief actions referred to supra note 24. The parties' postbriefs concessions are taken into account in tables 7 and 8, supra.

(3) Returned Checks (NSF)

The parties stipulated that returned checks (insufficient funds) were not less than $7,132 in 1995.[25] Petitioners' only contention as to the 1995 returned checks (insufficient funds) was among the items respondent conceded in the postbriefs actions referred to supra note 24.

(4) Gifts

The parties stipulated petitioners received as gifts from relatives checks and cash that were deposited totaling "no less than" $265 in 1994 and "no less than" $502 in 1995.[26]

On opening brief, petitioners contend that Sandra "calculated" that petitioners' bank deposits included cash gifts from relatives in the amounts of "about" $2,490 in 1994 and "about" $5,235 in 1995. On answering brief, petitioners contend

----

[24](...continued)
and $6,000 was agreed to in proceedings under a motion to reopen the record after the answering briefs were filed.

[25] Of this 1995 total, $7,082 was stipulated before trial and $50 was agreed to in the postbriefs actions referred to supra note 24.

[26] Of this 1995 total, $402 was stipulated before the trial and $100 was agreed to in the postbriefs actions referred to supra note 24.

that the correct total amounts of cash and checks are $3,208 in 1994 (an increase of $2,943 from the stipulation) and $3,276 in 1995 (an increase of $2,874 from the stipulation).  On answering brief, petitioners contend that $1,000 cash was deposited into the Premier Bank personal account.  Although petitioners have not directed our attention to evidence of record, our examination shows that this deposit is listed on Exhibit 40-J (p.1).  On answering brief, petitioners further state that this $1,000 was "for Mrs. Downing's birthday".  Petitioners have not directed our attention to evidence of record on this latter point, which we gather to be an implicit assertion that the $1,000 was a gift, and we have not found any such evidence.  Respondent has the burden of proving by clear and convincing evidence that there is an underpayment, but respondent cannot properly be charged with negativing theoretical possibilities first asserted on answering brief without foundation in the evidentiary record.

We are satisfied that the stipulated gift deposits are all that should be allowed (except for the $100 discussed in note 26, supra), for the following reasons:

(a)  On neither opening nor answering brief have petitioners directed our attention to any evidence in the record that supports the numbers for which they contend, or any other amounts that exceed the stipulated minima.

(b)   Petitioners do not explain the differences between their contended-for amounts in their opening and answering briefs.

(c)   Sandra testified that her mother typically bought savings bonds for Rachel and Sean, and that her mother kept the bonds until well after the years in issue.  Clearly, those gifts (whatever their amounts) would not have been deposited in any of the listed accounts in 1994 or 1995, or otherwise spent by petitioners in those years, and so no adjustment should be made on account of those 1994 gifts or 1995 gifts.

(d)   On answering brief, petitioners explain their lack of evidence on this issue by stating "that Petitioners were unsuccessful in persuading any of the relatives to attend the trial as a witness despite numerous efforts."  However, although petitioners' witness list includes four close relatives, none of these relatives was to testify about gifts from them (or from any other relatives they were aware of) in 1994 or 1995.

Under these circumstances we conclude that the reason petitioners did not have evidence of additional gifts that were deposited is that there were not any such additional gifts.  We hold that respondent has established by clear and convincing evidence the correctness of the table 7 and 8 adjustments on account of gifts.

(5)  Expense Checks From LCR; Rebates

Petitioners do not dispute the adjustments on account of expense reimbursement checks from LCR (Sandra's employer) and rebate checks, as shown in tables 7 and 8, supra.

(6)  Business Expenditures--Cash

Respondent contends that, to the extent petitioners made business expenditures in cash that did not go through bank accounts, petitioners had sources of income in addition to the amounts they deposited into the bank accounts.  Petitioners contend (a) they had nontaxable sources of cash, chiefly family gifts (discussed supra) and the cash hoard (discussed infra), and (b) their business cash expenditures amounted to less than the amounts for which respondent contends.

(a)  1994.--Respondent contends petitioners made $25,612 business expenditures in cash in 1994.  Petitioners contend on answering brief the correct amount is only $18,308.  Both sides calculate the cash expenditures by starting with "total expenditures reported" of $64,070.  Both sides subtract from this amount, $4,100 telephone expenses and $624 insurance expenses.  Respondent further subtracts $29,969 (business checks) and $3,765 (credit cards), totaling $33,734.  Petitioners contend that $41,038 business expenditures were made by check and credit cards.  Thus, the difference between the parties on this matter is accounted for entirely by the differences in their contentions

as to business expenditures made by check and business expenditures made by credit card.

Respondent's numbers on these two items are the numbers that the parties stipulated. Petitioners' numbers are contrary to the stipulations. The stipulations are binding, unless the parties agree otherwise or the Court relieves a party from the binding effect "where justice requires." Rule 91(e). Petitioners have not asked to be relieved from these stipulation, and nothing has been brought to the Court's attention that leads us to conclude that justice so requires. Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 253 (2002).

We hold that respondent has established by clear and convincing evidence the correctness of the 1994 adjustment (supra table 7) on account of business expenditures made by cash.

(b) 1995.--Respondent contends petitioners made $4,136 business expenditures in cash in 1995.[27] Petitioners contend on answering brief the correct amount is zero. Both sides calculate the cash expenditures by starting with "total expenditures reported" of $80,615. Both sides subtract from this amount, $4,600 telephone expenses and $1,250 insurance expenses.

---

[27] Respondent's contention on brief was $5,534. However, in the postbriefs proceedings (supra note 24) respondent conceded that three checks for Ford F250 truck payments (total $1,200) and one check for truck insurance ($198) should be added to the stipulated business expenditures made by check. This concession reduces pro tanto respondent's contention as to cash business expenditures.

Respondent further subtracts $66,412 (business checks--$65,014 plus $1,200 plus $198) and $4,217 (credit cards), totaling $70,629. Petitioners contend that $82,576 business expenditures was made by checks and credit cards. Thus, the difference between the parties on this matter is accounted for entirely by the differences in their contentions as to business expenditures made by check and business expenditures made by credit card.

Respondent's numbers on these two items are the numbers that the parties stipulated, adjusted to include respondent's postbriefs concessions. Supra note 24. As we noted in discussing the 1994 cash business expenditures, the parties are bound by their stipulations, and we hold that respondent has established by clear and convincing evidence the correctness of the 1995 adjustment (supra table 8) on account of business expenditures made by cash.

(7)  Personal Living Expenditures--Cash

Respondent contends that, to the extent petitioners made personal living expenditures in cash that did not go through the bank accounts, petitioners had sources of income in addition to the amounts they deposited into the bank accounts. Petitioners contend (1) respondent included certain cash expenditures in this category that are not personal living expenditures, and (2) respondent included certain expenditures in this category that are not cash expenditures.

(a) <u>1994</u>.--Respondent contends that petitioners made $6,154 personal living expenditures in cash in 1994. Petitioners contend the correct amount is only $1,216.

Respondent treats as a personal cash expenditure the $2,100 cash downpayment petitioners made for the Ford F250 truck. We agree with petitioners that the $2,100 is a business cash expenditure, and that it should not be included in the personal expenditure category. The $2,100 is a part of the $25,612 business cash expenditures that we have upheld, <u>supra</u>.

The remaining $4,054 consists of groceries expenditures made by cash. Petitioners seem to agree that $4,054 is the correct starting number, but "propose" that that be reduced by 70 percent on the ground that that percentage "be deemed to be paid by credit card based on Mrs. Downing's testimony (R.75) that she typically deposited the cash savings into the bank accounts and then paid the personal bills from there."

Sandra's testimony reflected on the cited trial transcript page explains as follows:

> A. [Sandra] The cash that was deposited into the joint personal checking account that belonged to Michael and I [sic] came from savings that Michael had accumulated over the years and gifts from relatives on his side of the family and mine.
>
> Q [Ponseti] Why was this cash deposited into the joint personal account?
>
> A The money was deposited into the checking account to supplement income in order to pay bills.

Q  Why were these cash deposits not added into the
gross income for 1994 and 1995?

A  Because it wasn't gross income that was earned
during those two tax years.

Thus, the cited testimony deals with amounts deposited into the
bank accounts, and does not tell us anything about cash
expenditures that bypassed the bank accounts.

The parties stipulated that during 1994 "petitioners spent
no less than $85 per week on personal grocery expenses, for a
total of $4,420."  Respondent does not contend petitioners spent
more than $4,420 on personal grocery expenses.  Petitioners do
not contend they spent less.  The parties' stipulated listing of
1994 "personal living expenses which petitioner paid by check"
shows only three such payments, totaling $366, under the category
"Food".  Total personal grocery expenses of $4,420, less $366
food expenses paid by check, leaves $4,054 grocery expenses paid
by cash.  In light of the irrelevance of the only evidence
petitioners rely on for their objection, we conclude that the
foregoing constitutes clear and convincing evidence of the
correctness of the 1994 adjustment (supra table 7) on account of
personal living expenditures made by cash.

(b) 1995.--Respondent contends for an adjustment of $11,618;
petitioners for an adjustment of $5,600.  Both sides agree that
petitioners' $5,000 cash house downpayment should be included in
this adjustment.  For the same reasons we expressed as to 1994,

we agree with petitioners and reject respondent's proposal to include $4,718 truck payments.  For the same reasons we express as to 1994, we agree with respondent and reject petitioners' proposal to reduce the $1,900 groceries to $600.  We conclude that the foregoing constitutes clear and convincing evidence of the correctness of the 1995 adjustment (supra table 8) on account of personal living expenditures by cash.

(8)  Bank Balances

The parties have stipulated the opening and closing listed accounts balance totals shown in tables 7 and 8.

(9)  Nontaxable Cash

As noted supra (items (6) and (7)), cash expenditures (i.e., expenditures made by cash that did not go through the bank accounts) are added to bank deposits in order to determine the amount of potentially taxable receipts that must be accounted for.  One way to account for cash expenditures as not having a taxable source in that taxable year is to determine the amount of cash petitioners had available to them that came from nontaxable sources.  In the instant cases, respondent agrees that petitioners had a substantial amount of cash available to them

from nontaxable sources.[28]  We consider seriatim the components of the category of cash from nontaxable sources.

(a)  The Newman Property.--Michael sold the Newman property on November 15, 1993.  The net proceeds were $31,307.06. Respondent, relying on Klimkiewicz's testimony based on her notes as to what Sandra said at a meeting during the audit, contends that petitioners spent $2,000 of these net proceeds in 1993, had $29,307 left at the beginning of 1994, and spent all this $29,307 in 1994.  Petitioners deny the correctness of Klimkiewicz's notes on this matter and "suggest that at most $1,600 * * * was spent during 1993. * * * For the sake of computing numbers only, the Petitioners will assume the amount of $1,600."  As a result, petitioners contend that the correct amount for this component is $29,707.  Both sides agree that, by the end of 1994, petitioners spent all that remained of the Newman property proceeds.

Taking into account the conflicting testimony, and the fact that this testimonial conflict is solely as to what Sandra said to Klimkiewicz in 1996 as to Sandra's 1996 estimate of what petitioners spent out of this source in 1993, we conclude (and we

---

[28]  Respondent refers to this category of items as "nontaxable undeposited cash".  (Emphasis supplied.)  Yet, for 1994 respondent would allow $39,507 to be subtracted, even though respondent would have included only $31,766 of cash expenditures. Thus, respondent appears to have implicitly accepted petitioners' contentions (and Sandra's testimony) that, at least in 1994, petitioners took money from some cash storage and, at least to the extent of $7,741 ($39,507 minus $31,766), deposited that money into the bank accounts.

have found--tables 7 and 8) that respondent has shown by clear and convincing evidence that not more than $29,707 of petitioners' 1994 expenditures came from the Newman property net proceeds, and that none of petitioners' 1995 expenditures came from this source.

(b) Credit Card Advances.--Both sides agree that petitioners received two credit card cash advances, totaling $5,500, in 1994. Petitioners contend on answering brief that they received two additional cash advances, of $1,942 and $2,113, in 1994. However, in the postbriefs actions referred to supra note 24, petitioners concede that "the credit card amount of $2113.15 is really just a transfer and not a Cash Advance and * * * the $1,942 amount was used to pay off a credit card debt. As such, it should not be counted as a credit card advance for 1994." Respondent does not allow, and petitioners do not contend for, 1995 credit card advances. Thus, the allowance of $5,500 credit card advances for 1994 and nothing for 1995 is agreed to by both sides.

(c) Child Support.--The parties stipulated that petitioners received $4,200 in cash child support payments for Rachel and Sean in each year, 1994 and 1995. Supra note 5.

(d) Refund of Deposit on House.--The parties stipulated that in 1994 petitioners received a refund of a $500 deposit on a house.

(e)  Michael's Accumulated Savings.--Originally, Michael told respondent's revenue agent that, at the beginning of 1994, he had a cash hoard of $180,000, which he had accumulated over the years.  At trial, Michael testified that he had "Roughly * * * around 60 to 70,000" in the cash box at the beginning of 1994 and that he "ran out of money a year after I bought the Metairie Court house", which he bought on March 24, 1995.  Respondent allowed as a starting 1994 cash hoard only the remaining net proceeds of the sale of the Newman property, together with the credit card advances, 1994 child support, and deposit refund, and treated the entire allowed amount as having been spent in 1994; respondent has not allowed any starting 1995 cash hoard.  Petitioners do not appear to have taken any position as to how much of their claimed cash hoard was spent in 1994 (except for Sandra's testimony that she had told Klimkiewicz that all the remaining net proceeds of the sale of the Newman property had been spent by the end of 1994), how much was spent in 1995, and how much was spent (consistent with Michael's above-quoted testimony) in early 1996.  On brief, petitioners appear to have abandoned Michael's $180,000 contention and instead adopted as their position Michael's above-quoted trial testimony.

(i)  For Cash Hoard

Considerations pointing toward cash hoard include the following:  (1) Respondent has already accepted the idea that

petitioners kept a large amount of cash someplace (not necessarily in a box) for some period of time--viz the $29,000-plus remainder of the Newman property proceeds, which was used from time to time during 1994.  (2) Respondent has already accepted the idea that petitioners on occasion deposited nontaxable cash receipts into the bank accounts.  As noted supra, respondent agrees that for 1994 petitioners should be allowed to subtract more in nontaxable cash than petitioners' 1994 cash expenditures.

   (ii)  Against Cash Hoard

   Considerations pointing against cash hoard include the following:  (1) Petitioners' claim of cash hoard, even if accepted in entirety, would explain only a small fraction of the otherwise-unexplained omitted income; in the context of clear and convincing evidence of substantial omitted income in 1995 on the record herein, it is difficult to credit Michael's testimony as to any specific amount.  (2) Michael's testimony as to the cash hoard, especially in light of his acknowledged earlier statements, seems to be tailored to his time-to-time perceptions of what suits his purposes, rather than his best recollection of the actual events.  Michael's written statement to Klimkiewicz at the July 1997 meeting was specific in describing why he estimated

he had a January 1, 1994, cash hoard of $180,000.[29]  At trial, he

---

[29]  On cross-examination, Michael testified as follows:

Q  [Canavello]  Mr. Downing, is this a typewritten statement that you provided to the revenue agent at the July meeting in 1997?  Not the handwritten part, just the typing part.

A  (Perusing documents.)  Oh. Yes, it is.

Q  Thank you.  I'd like you to read this sentence right here to me, please, at the beginning of this -- this little paragraph here.

A  "I did not use any of my savings until 1994." That?

Q  Yes.  Thank you.  And on the second page, would you read for me, please -- would you read me the numbers -- this part of it, please, from here to here?

A  "Approximate 1974 through 1981 estimated savings, 40,000.  Approximate between 1982 and 1987, estimated annual savings, 15,600."

Q  Yes.

A  "Times five years equals 78,000.  Approximate 1988 through 1989 estimated savings while employed at Millican [Milliken] & Michaels, 31,000.  Sale of house in 1993 profit approximately 31,000.  Total of 180,000."

Q  So now these would be the items that you listed in your statement that you just identified, this statement here that you brought to that meeting, as being the amounts that added up to what was in the cash box?

A  Approximately.  A rough estimate.

Q  Thank you very much.

So then, when you prepared that statement, your estimate of what was in the cash box as at the beginning of 1994 was $180,000?

A  I was speculating -- or estimate.

explained the $180,000 as a rough estimate.  At trial, he

testified that the correct January 1, 1994, amount was roughly

$60,000 to $70,000.  He did not explain in his testimony why his

rough estimates at trial differed from his rough estimate to

Klimkiewicz by about $110,000 to $120,000.  Nor did petitioners

clarify this substantial difference on brief.  (3) On numerous

occasions Michael borrowed--sometimes from family and sometimes

from business lenders--amounts for short terms and for long

terms.  In the case of borrowings from business lenders Michael

incurred substantial interest expenses.  Michael incurred these

expenses without seeking to earn income on what he contended were

large amounts in his cash hoard.  Because he neither earned on

his claimed cash hoard nor used his cash hoard to reduce

borrowings when opportunities were presented, it is evident that

Michael's actions were not significantly affected by any

evaluation of opportunity cost.

 (iii)  Analysis

 In DeVenney v. Commissioner, 85 T.C. 927, 933 (1985), we

stated that--

 we cannot fail to note that the existence of a cash
 hoard is endlessly claimed by taxpayers to explain the
 existence of otherwise unexplained sources of funds.
 It is rare indeed that a taxpayer successfully proves
 this contention.

In DeVenney, the taxpayers' evidence prevailed completely; not

only did it overcome the Commissioner's fraud contentions, but it

also resulted in our holding that the taxpayers had no deficiencies.  Id. at 928.  The record in the instant case is far different from that in DeVenney.

Although we are not willing to conclude that respondent has shown by clear and convincing evidence that petitioners had no cash hoard (other than the items respondent specifically allowed), we are satisfied that (1) any such cash hoard carryover into 1994 was not sufficient to substantially affect the amount of 1994 unreported income and (2) there was not any cash hoard carryover into 1995.

Our findings in tables 7 and 8, supra, incorporate these conclusions, on the lines labeled "Nontaxable Cash".

(10) Net Wages--Sandra

The parties have agreed that Sandra's net wages (i.e., Form W-2, Wage and Tax Statement, wages less withheld taxes) are as shown supra in tables 7 and 8.

(11)  Conclusions

We conclude and we have found that respondent has shown by clear and convincing evidence that Michael understated his plumbing business Schedule C gross receipts by the amounts set forth in tables 7 and 8, supra, in the columns headed "Court-- Fraud"--about $17,000 for 1994 and about $80,000 for 1995--and that these understatements of receipts resulted in

understatements of income, which in turn resulted in underpayments of tax for each year.

We hold for respondent on this issue.

B.  Fraudulent Intent

Respondent contends that the following indicia of fraud are present in the instant case:  (1) Petitioners failed to report substantial amounts of income; (2) petitioners failed to keep adequate books and records; and (3) petitioners made inconsistent and implausible explanations regarding the alleged nontaxable sources of deposits to their bank accounts during 1994 and 1995.

Petitioners maintain that:  (1) Michael had no intention to underreport income; (2) Michael provided the records he had to respondent throughout the administrative process; and (3) the alleged inconsistent statements "make no sense at all".

Courts have identified numerous factors, sometimes referred to as indicia of fraud, or badges of fraud, which may be persuasive circumstantial evidence of fraud.  See, e.g., Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).  We focus on those indicia that appear to be most significant in the context of the record in the instant case.

(1)  Failure To Report Substantial Amounts of Income

"Although mere understatement of income alone is not sufficient to prove fraud, the consistent and substantial understatement of income is, by itself, strong evidence of

fraud." Truesdell v. Commissioner, 89 T.C. 1280, 1302 (1987);
Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without
published opinion 621 F.2d 439 (5th Cir. 1980).

For 1994, Michael reported $68,758 of Schedule C gross
receipts from the plumbing business. Respondent has shown by
clear and convincing evidence that Michael should have reported
at least $85,683. Supra table 7. We conclude that the $16,925
difference is a substantial underreporting.

For 1995, Michael reported $82,721 of Schedule C gross
receipts from the plumbing business. Respondent has shown by
clear and convincing evidence that Michael should have reported
at least $162,038. Supra table 8. We conclude that the $79,317
difference is a substantial underreporting.

For the 2 years in issue, Michael failed to report an
aggregate of about 40 percent of his Schedule C gross receipts
from the plumbing business.

(2) Failure To Keep Adequate Books and Records

Taxpayers are required to maintain books and records
sufficient to show their tax liabilities. See sec. 6001.
Failure to do so is another indicium of fraudulent intent. See
Bradford v. Commissioner, 796 F.2d at 307.

Respondent contends that petitioners' records for the
plumbing business were incomplete and inconsistent. For 1995,
respondent points to the fact that the total amount of the adding

machine tape--the amount Michael purportedly reported on the
Schedule C for that year--was $5,781 more than the amount
actually reported on the Schedule C.  Respondent also points to
the fact that Sandra omitted from four of the invoices $8,683
when she was calculating the monthly totals.  For 1994,
respondent points to the fact that seven of the Forms 1099 issued
to the plumbing business exceeded by $7,941 the amounts listed on
their corresponding invoices.  Thus, respondent concludes:
"Petitioners  obviously were not concerned with having an
accurate record of the income from the plumbing business.  Their
method of record keeping, or lack thereof, is another badge of
fraud for 1994 and 1995.

> Petitioners reply, on answering brief, as follows:

> The volume of records, checks, invoices, bank statement
> [sic], bank deposit slips, the purchase agreements, the sale
> agreements, the mortgages, the amortization schedule, the
> social security statement, the marriage agreement, etc. are
> a silent testimony as to the efforts that Petitioners have
> made to accurately determine and substantiate the tax return
> that was filed.

Petitioners concede that Michael understated gross receipts for
the plumbing business by $5,781 in 1995; they attribute this
understatement to a computational error that occurred when Sandra
added together the invoices.  Petitioners argue, however, that
because Michael was a cash basis taxpayer, and because they did
not receive in 1995 the $8,683 that was listed on the invoices
but not included on the adding machine tape, they did not have to

report that income for that year.  (This seems to be inconsistent with petitioners' $5,781 concession.)  Petitioners further argue that, for 1994, the discrepancies between the amounts reported on the Forms 1099 and the amounts listed on the corresponding invoices were simply due to timing considerations.

We are somewhat puzzled by some of the assertions by both sides.  Firstly, petitioners were cash basis taxpayers.  The Schedules C for both years show that the plumbing business was on the cash basis.  Respondent's reconstruction of income and Michael's self-employment tax are cash-basis determinations.  Accordingly, Michael was required to report gross income from the plumbing business when it was received, not when the work was completed.  Sec. 451(a).  Sandra testified, however, that she computed gross income for the years in issue by adding together the invoices for the work Michael had done each month, and then adding together the monthly totals.  In addition, the parties stipulated, in relevant part, as follows:

> Attached as Exhibit 39-J are copies of adding machine tapes which petitioner Sandra Downing provided with the invoices she identified to respondent's revenue agent as gross receipts reported on the 1995 Schedule C for Michael Downing Plumbing Company.

Thus, it appears that Sandra calculated gross receipts from the plumbing business as if Michael were an accrual basis taxpayer.  If this is so, then the adding machine tape totals for the years in issue were not the proper amounts to report on the Schedules C

as gross receipts because those totals reflect the amounts due for work done, not the amounts received for the work. As such, Sandra's computational error in adding together the invoices for 1995 is irrelevant to the determination of the amount that should have been reported on the Schedule C. Nevertheless, this error in bookkeeping suggests that petitioners' records for the years in issue are insufficient to show Michael's tax liabilities.

Secondly, petitioners, for the first time on answering brief, appear to argue that the adding machine tape totals represent the amounts received by the plumbing business, not the total amount of the invoices. In response to respondent's proposed finding of fact that Sandra understated, by a total of $8,683, the amounts of four invoices shown on the adding machine tapes, petitioners claim that they did not have to report that $8,683 because they did not receive it. If petitioners did not receive the $8,683 in 1995, then they are correct that Michael was not required to report that amount on the Schedule C. However, as stated above, Sandra testified that she calculated gross receipts by adding together the invoices, not the receipts. And the parties stipulated that Sandra provided to the revenue agent copies of the adding machine tapes along with the invoices used to calculate gross receipts for the plumbing business. We do not know whether petitioners did not realize until answering

brief that they calculated gross receipts incorrectly or whether they incorrectly described their method of calculation.

Lastly, because petitioners were cash basis taxpayers, it would not be surprising to find that the amount reported on a Form 1099 is different from the total amount of the corresponding invoices.  The Form 1099 amount may be less in situations where the customer paid only part or some of the invoices.  The Form 1099 amount may be greater than the total amount of the corresponding invoices in situations where the customer paid for services rendered in prior years.  Thus, it is possible, as petitioners contend, that the discrepancies are due to "timing considerations".  Petitioners, however, have not provided us with any records from which we can ascertain the actual relationships between the Form 1099 amounts and Michael's plumbing business receipts for the years in issue.

Accordingly, based on the record as a whole, we conclude that Michael's books and records are sufficiently confused so that they do not reliably show the gross receipts from the plumbing business, and consequently, Michael's tax liabilities, for the years in issue.

(3)  Inconsistent and Implausible Explanations

Petitioners attribute a significant portion of their bank deposits for the years in issue to Michael's cash hoard. Respondent maintains that petitioners' explanations and behavior

do not support petitioners' contention.  Petitioners contend that the "inconsistent statements" were due to the selective hearing of Klimkiewicz.  Petitioners sum up their contentions as follows:

> The Alleged Inconsistent Statements are discussed throughout this reply brief and there is no need to repeat these same arguments.  It should also be mentioned that all of these alleged inconsistent statements are also arguably the self-serving testimony of the Revenue Agent * * *.

We agree with respondent.

<u>Firstly</u>, Michael's testimony at trial is inconsistent with the written statement Michael provided to Klimkiewicz regarding the amount of cash remaining in the box at the beginning of 1994.  At trial, Michael testified that there was roughly $60,000 to $70,000 cash in the box at the beginning of 1994.  During the July 1997 meeting, however, Michael provided to Klimkiewicz a prepared, detailed statement in which he declared that he had a total of $180,000 in cash at the beginning of 1994.  At trial, Michael acknowledged that he prepared this written statement and that he presented it to Klimkiewicz at their July 1997 meeting.  When questioned at trial about this substantial discrepancy, Michael replied that when he prepared the written statement in 1997, he "was speculating".  This conflict is not attributable to any asserted "selective hearing" by Klimkiewicz.

We also note that Michael testified that he ran out of cash a year after he bought the Metairie Court property.  Michael bought the Metairie Court property in March of 1995.  At the July

1997 meeting, when Klimkiewicz asked Michael how much remained in the box at the time of the meeting, Michael told her to subtract out from the alleged $180,000 that existed at the beginning of 1994 the amount she was proposing as a deficiency, and that would be the amount remaining in the box at that time.  On brief, petitioners state that they do not dispute that, at that meeting, Michael did make this statement.  Petitioners do not contend that Klimkiewicz's "selective hearing" was incorrect as to this point.  This statement to Klimkiewicz was made more than 2 years after Michael bought the Metairie Court property, and more than a year after all of the cash from the box had been spent, according to Michael's trial testimony.

As we indicated <u>supra</u> (part A(9)(e)(ii) of this opinion), Michael's trial testimony and his oral and written statements to respondent's agent during the audit, seem to be tailored to his shifting perceptions of what suits his purposes, rather than to his best recollections of actual events.

<u>Secondly</u>, it has long been established that a taxpayer's "recurring need to borrow money is inconsistent with the claim to a secret hoard.  <u>Boyett v. Commissioner</u>, 5 Cir., 1953, 204 F.2d 205."  <u>Cefalu v. Commissioner</u>, 276 F.2d 122, 127 (5th Cir. 1960), affg. T.C. Memo. 1958-37.  Respondent points to petitioners' extensive borrowing--a total of $391,615, respondent says (our calculations are slightly less), with interest rates ranging from

9.9 percent to 13.25 percent--as being inconsistent with having a cash hoard.

> When asked why he financed the cars, Michael replied:
>
> The reason why I finance everything is because, listening to Mike Sanderson that's so successful was -- his big thing was use other people's money and put down as little as possible or nothing, and that's what I was doing.

On answering brief, petitioners assert that "This strategy is not an uncommon one as many 'financial gurus' explain at seminars that this is one way to make money."   While we do not doubt that "this is one way to make money", we strongly doubt Michael intended to do so by paying high interest rates while earning no interest income on the alleged cash hoard.  Moreover, in response to the Court's question whether Michael had noticed that, during the early 1980s, banks were advertising interest rates of 10 percent or higher on savings deposits, Michael stated:  "I've never been one to look at anything like that to -- no concern." We cannot reconcile this statement with Michael's alleged desire to make money in the manner that Sanderson allegedly did.  We believe Michael's testimony on this point was incredible. Michael's incredible explanations of his behavior constitute an additional "badge of fraud".  Bradford v. Commissioner, 796 F.2d at 307; Boyett v. Commissioner, 204 F.2d at 208.

In addition, between May 30, 1994, and March 21, 1995, petitioners took a total of $10,500 in cash advances.

Petitioners paid an annual percentage rate of 18.13 percent on at least $5,000 of that amount.  All of the cash advances were taken before Michael bought the Metairie Court property, when, according to Michael's testimony, he had cash remaining in the box.  Petitioners have not provided, and we cannot discern, any reasonable explanation for their willingness to pay high interest rates on cash advances when they allegedly had a substantial cash hoard.

Based on the foregoing indicia of fraud, we conclude that respondent has proved by clear and convincing evidence that some or all of the underpayments of tax that result from Michael's failure to report all of his plumbing business Schedule C gross receipts were due to Michael's fraud.  We have so found.

We hold for respondent on this issue.

C.  Amounts; Burdens of Proof

In parts II-A and II-B of this opinion, respondent had the burden of proving, by clear and convincing evidence, that there were underpayments of tax, some part of which was due to Michael's fraud; respondent carried this burden for each year in issue.

(1)  Under section 6663(b), the entire underpayment of tax for each year is treated as attributable to fraud, "except with respect to any portion of the underpayment which the taxpayer

establishes (by a preponderance of the evidence) is not attributable to fraud."

As we noted, supra, in the notices of deficiency, respondent determined that, in essence, every element of each year's underpayment was due to fraud.  On brief, respondent's fraud contentions focus entirely on the unreported Schedule C gross receipts.  We treat this as respondent's concession that the fraud penalty applies only to so much of the underpayment as results from the unreported Schedule C receipts.  On the basis of the preponderance of the evidence, we conclude that for each year in issue the fraud penalty applies to all of the underpayment that results from the unreported Schedule C receipts.

(2) In general, petitioners have the burden of proving, by a preponderance of the evidence, that the deficiencies[30] are less than the amounts respondent determined in the notices of deficiency.  See Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).[31]  However, respondent has the burden of proof

---

[30]  For purposes of the instant case, "deficiency" is the same as "underpayment".  Compare sec. 6211(a) with sec. 6664(a).

[31]  Sec. 7491, which shifts the burden of proof to the Commissioner if the taxpayer meets certain conditions, does not apply in the instant case because the examination of petitioners' tax returns began in 1996 or 1997, before the July 22, 1998, effective date of sec. 7491.  Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(a), 112 Stat. 726.

with respect to "new matter", including increased deficiencies.
Rule 142(a)(1).

Because all of our redeterminations except fraud have been
made on the basis of the preponderance of the evidence, it is not
necessary to decide which side has the burden of proof as to any
item. See, e.g., Romann v. Commissioner, 111 T.C. 273, 285
(1998); Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210
n.16 (1998), and cases cited therein.

Our preponderance-of-the-evidence findings as to omitted
Schedule C receipts are shown in the right-most columns of tables
7 and 8, supra. All other adjustments, whether related to
adjustments in the notices of deficiency or other matters, have
been resolved by way of concessions or stipulations.

These redeterminations, stipulations, and concessions are to
be given effect in the Rule 155 computations and will govern
whether any part of the deficiency for either of the years in
issue is not due to fraud.

To the extent that any part of the deficiency for either of
the years in issue is not due to fraud, see part IV of this
opinion.

## IV. Negligence

In the notices of deficiency, respondent determined, in the
alternative to the fraud penalties under section 6663, that
Michael is liable for the negligence penalties under section

6662(a).  Respondent contends that Michael's "substantial
omissions of income and other factors set forth above [e.g.,
Michael's failure to keep adequate books and records]" clearly
show that the negligence penalties apply in the instant case.
Petitioners do not appear to contest this.[32]

Accordingly, we conclude that section 6662(a) applies for
each year in issue to that portion, if any, of Michael's
underpayments determined in the Rule 155 computation to be
attributable to items other than the unreported Schedule C gross
receipts.

To take account of the parties' concessions and the
foregoing,

Decision will be entered

under Rule 155.

---

[32]  Petitioners argued that reasonable cause excused their
failure to report one-half of their respective spouse's income on
their separate tax returns.  Because we concluded that
petitioners properly filed for registry their marriage contract
so as to keep their respective incomes the separate property of
the income-earning spouse, we need not address this defense to
the negligence penalty.